## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY, COVINGTON DIVISION

| | | |
|---|---|---|
| WILLIAM VIRGIL, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| CITY OF NEWPORT, CITY OF | ) | |
| CINCINATTI, CITY OF NORWOOD, | ) | |
| Newport Police Officers MARK | ) | JURY TRIAL DEMANDED |
| BRANDT, NORM WAGNER, PAT | ) | |
| MOORE, HOWARD NIEMEIER, | ) | |
| SARAH DESENTRY, SGT. | ) | |
| BRADFORD, LT. COL. KEN PAGE, | ) | |
| LT. TOM FROMME, LT. RICK | ) | |
| SEARS,  Cincinnati Police Officers | ) | |
| MIKE SLAYBACK, ROBERT | ) | |
| CARDONE,MIKE PHILLIPS, | ) | |
| Norwood Police Officer STEVE | ) | |
| DANIELS. | ) | |

Defendants.

NOW COMES Plaintiff, WILLIAM VIRGIL, by his attorneys LOEVY &

LOEVY, and complaining of Defendants CITY OF NEWPORT, CITY OF

CINCINATTI, Newport Police Officers MARC BRANDT, NORM WAGNER, PAT

MOORE, HOWARD NEIMEIER, SARAH DESENTRY, SGT. BRADFORD, Newport

Police Lieutenants RICK SEARS, TOM FROMME, and KEN PAGE, Cincinnati

Police Officers MIKE SLAYBACK, ROBERT CARDONE, and MIKE PHILLIPS,

Norwood Police Officer STEVE DANIELS, and other unknown officers from the

Newport, Cincinnati, and Norwood Police Departments, states as follows:

## Introduction

1.    Plaintiff, William Virgil, spent 28-years incarcerated for a murder that he did not commit.

2.    Mr. Virgil was convicted after Newport police officers, and others working in concert with them, manipulated witnesses, fabricated evidence, and withheld exculpatory information that would have demonstrated his absolute innocence of this crime.

3.    Despite Mr. Virgil's innocence, the Defendants built an entirely circumstantial case against him that hinged upon the testimony of a jailhouse snitch – testimony that was fabricated, false, manufactured, and purchased by the Newport Defendant Officers.

4.    In addition to this, both before and after his wrongful conviction, Defendant Officers conspired to withhold and destroy exculpatory evidence that directly implicated other suspects.

5.    For these reasons, as part of their conspiracy to frame Mr. Virgil, the Defendant Officers agreed to withhold that exculpatory evidence from Mr. Virgil, his counsel, and the prosecutors.

6.    In short, as described in more detail below, the Defendants framed Mr. Virgil for murder and took significant steps over three decades to conceal their egregious misconduct.

7.    Although Mr. Virgil's conviction has been reversed, he will never regain the lost decades of his life.  This lawsuit seeks redress for his injuries.

## Jurisdiction and Venue

8.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the U.S. Constitution.

9.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

10.     Venue is proper under 28 U.S.C. § 1391(b) and (c). On information and belief, all parties reside in this judicial district, and the events giving rise to the claims asserted herein all occurred within this district.

## The Parties

11.     Plaintiff William Virgil is a 64 year-old resident of Florence, Kentucky.

12.     At all relevant times, Defendants Marc Brandt, Norm Wagner, Pat Moore, Howard Neimeier, Sarah Desentry, and Sgt. Bradford were officers with the City of Newport Police Department and employed by Defendant City of Newport and acting within the scope of their employment for the City of Newport.

13.     At all relevant times, Defendants Ken Page, Rick Sears, and Tom Fromme, were lieutenants with the City of Newport Police Department and employed by Defendant City of Newport and acting within the scope of their employment.

14.     Defendants Brandt, Wagner, Moore, Neimeier, Desentry, Bradford, Page, Sears, and Fromme are referred to collectively as the "Newport Defendants."

15.     Defendant City of Newport is a Kentucky municipal corporation, and is and/or was the employer of Defendants Brandt, Wagner, Moore, Neimeier, Desentry, Bradford, Page, Sears, and Fromme.  The City of Newport is responsible for the acts of the Defendant Officers while employed by the City of Newport and while acting within the scope of their employment.  At all times relevant to this Complaint, the City of Newport was a city with home rule as enabled, defined and empowered under KRS 83.410-83.660, as well as KRS Chapter 83A, 91, and 91A. The City of Newport is responsible for the policies, practices, and customs of the Newport Police Department.

16.     At all relevant times, Defendants Mike Slayback, Robert Cardone, and Mike Phillips were officers with the City of Cincinnati's Police Department and employed by Defendant City of Cincinnati and acting within the scope of their employment for the City of Cincinnati.

17.     Defendants Mike Slayback, Robert Cardone, and Mike Phillips are referred to collectively as the "Cincinnati Defendants."

18.     Defendant City of Cincinnati is an Ohio municipal corporation that operates the Cincinnati Police Department (the "Cincinnati Department"). The City of Cincinnati is liable for all torts committed by the Cincinnati Defendant Officers while employed by the City of Cincinnati pursuant to the doctrine of *respondeat superior*. The City of Cincinnati is additionally responsible for the policies and practices of the City of Cincinnati and the Cincinnati Police Department.

19.     At all relevant times, Defendant Steve Daniels was an officer with the City of Norwood's Police Department and employed by Defendant City of Norwood and acting within the scope of their employment for the City of Norwood.

20.     Defendant Daniels is referred to collectively as the "Norwood Defendant."

21.     Defendant City of Norwood is an Ohio municipal corporation that operates the Norwood Police Department (the "Norwood Department"). The City of Norwood is liable for all torts committed by the Norwood Defendant Officers while employed by the City of Norwood pursuant to the doctrine of *respondeat superior*. The City of Norwood is additionally responsible for the policies and practices of the City of Norwood and the Norwood Police Department.

### The Rape and Murder of Retha Welch

22.     On April 13, 1987, Ms. Welch's body was found at her apartment located at the Yacht and Tennis Club in Newport, Kentucky.  According to the post-mortem examination, Ms. Welch had been raped and stabbed twenty-eight times.

23.     Mr. Virgil had absolutely nothing to do with the rape and murder of Ms. Welch.

24.     During their search of the crime scene, Newport police officers recovered approximately 68 pieces of physical evidence, including two knives.

25.     The next day, Ms. Welch's Cadillac was recovered near a courthouse in Covington, Kentucky.

### The Framing of William Virgil

26.     There was never any physical evidence tying Mr. Virgil to the murder of Ms. Welch.  Indeed, the physical evidence in the case demonstrated that Mr. Virgil was completely innocent.

27.     Specifically, on April 13, 1987 a rape kit obtained by Newport police officers during the evidence collection process completely excluded Mr. Virgil from being a contributor to the semen found inside of Ms. Welch.  What is more, while the tests from the rape kit excluded Mr. Virgil, those same results linked three unknown and unidentified profiles to the individual or individuals who raped and killed Retha Welch in April of 1987.

28.     Unfortunately, however, the DNA testing that revealed Mr. Virgil's innocence was not available at the time of his trial in 1988.  The testing that conclusively demonstrates Mr. Virgil's innocence was accomplished in 2015, 28-years after Ms. Welch's rape and murder.

29.     Despite there being no evidence tying Mr. Virgil to this crime, on April 23, 1987, Defendant Brandt signed a criminal complaint against Mr. Virgil for the murder of Ms. Welch knowing that probable cause did not exist to do so.  The Defendant Officers relied upon false and fabricated statements to initiate the charges against Mr. Virgil.

#### The Newport Defendant Officers Withheld Exculpatory Evidence and Fabricated a Statement for a Jailhouse Snitch

30.     The Newport Defendants continued their conspiracy to frame Mr. Virgil after the initiation of false charges on April 23, 1987.

31.     To this end, the Newport Defendants procured a false and fabricated statement from Joe Womack, an inmate incarcerated at Lebanon Correctional Institution (where Mr. Virgil was being held in custody at the time).

32.     On September 28, 1987, Defendant Wagner travelled to Lebanon Correctional Institution to meet with Mr. Womack.  During that meeting, Defendant Wagner coerced Mr. Womack into falsely implicating Mr. Virgil for the murder of Ms. Welch.

33.     Defendant Wagner provided Mr. Womack with information related to the murder of Ms. Welch and instructed Mr. Womack to repeat this information in a fabricated audio recorded statement.  Defendant Wagner threatened Mr. Womack that if he did not comply in making the false and fabricated statement, he himself would be charged with the murder of Ms. Welch.

34.     Not wanting to be falsely charged with a murder he did not commit, Mr. Womack provided an audio recorded statement in which he falsely alleged that Mr. Virgil confessed to murdering Ms. Welch by hitting and stabbing her prior to leaving her in the bathroom of her apartment.

35.     Defendant Wagner also made undisclosed promises of consideration to Mr. Womack in exchange for his false and fabricated statement.  For example, Defendant Wagner promised to get Mr. Womack released from prison if he would agree to falsely implicate Mr. Virgil in the murder of Ms. Welch.

37.     At some point after this interview, Mr. Womack was transferred from Lebanon Correctional Institution to a jail in Newport, Kentucky.

38.     While incarcerated at the jail, the Newport Defendants visited Mr. Womack and provided him with money so that he would be "comfortable" during his incarceration.  The Newport Defendants also provided Mr. Womack with a transcription of his audio recorded statement described above, rehearsed his false statement with him, and informed Mr. Womack that they wanted him to provide this same false statement to the grand jury.

39.     The following day, the Newport Defendants transported Mr. Womack from the jail to the courthouse and provided him with a "cheat sheet" that included details about the murder from Mr. Womack's audio recorded statement that the Newport Defendants wanted Womack to falsely testify to in front of the grand jury.

40.     Indeed, the Newport Defendants went so far as having Mr. Womack rehearse his testimony for more than an hour while they went through each detail of his false statement in an effort to make sure that he testified consistently with that statement.

41.     After this rehearsal, Mr. Womack was instructed to take his "cheat sheet" and the transcript of his recorded statement back to his cell so that he could memorize his false testimony.

42.     The "cheat sheet" provided to Mr. Womack by the Newport Defendants consisted of 3-4 pages of information from their investigation into the Welch homicide.  The Newport Defendants provided this document to Mr. Womack for the express purpose of having him memorize these details in order to falsely attribute them to a conversation he had with Mr. Virgil at the Lebanon Correctional Center.

8

43.     At the grand jury proceeding, Mr. Womack falsely testified to the fabricated story that the Newport Defendants had fed to and coerced from him.

44.     Mr. Womack subsequently testified at trial against Mr. Virgil.  Not surprisingly, his testimony was damning.  Just as he did in front of the grand jury, Mr. Womack testified that Mr. Virgil confessed to murdering Ms. Welch, in the process reciting the details of the crime provided to him by the Newport Defendants.

45.     Mr. Virgil was wrongfully convicted as a result of Mr. Womack's testimony.   According to the trial prosecutor, Mr. Womack "was a material witness in the case and his testimony represented a large piece of the circumstantial puzzle of evidence…presented [to the jury]."

46.     In 2016, Mr. Womack revealed in a sworn declaration that his statement, testimony in front of the grand jury, and testimony at trial was false – a product of fabrication and coercion on the part of the Newport Defendants.

47.     None of the circumstances surrounding Mr. Womack's coerced and fabricated false statement were ever disclosed to Mr. Virgil or the Commonwealth by the Defendant Officers prior to his criminal trial or at any time thereafter.

48.     Once the Newport Defendants secured the false and fabricated statement from Mr. Womack, the Defendant Officers ignored all the substantial evidence suggesting that others had committed the murder of Retha Welch.

49.     Rather than continue to perform the police work necessary to properly solve the crime, the Defendant Officers instead conspired amongst themselves and with others to shortcut the process.  Specifically, the Defendant Officers unjustly

singled out Mr. Virgil, and then endeavored to stretch and manipulate the facts and evidence to fit the false hypothesis that he was guilty of the crime.

50.     In that regard, the Defendant Officers manufactured "evidence" that falsely implicated Mr. Virgil and withheld from prosecutors and from Mr. Virgil evidence that was both exculpatory and material.

51.     This unconstitutional conduct included, but was not limited to, coercing and manipulating Mr. Womack into falsely implicating Mr. Virgil, as well as withholding the coercive circumstances surrounding that false statement, and withholding information regarding other similar murders that were committed in Norwood and Cincinnati.

52.     The Defendant Officers also disregarded and/or destroyed exculpatory evidence that should have been preserved.  The Defendant Officers further deliberately and affirmatively failed to investigate and develop information that would have helped to establish the guilt of an individual other than Mr. Virgil. Consistent with that endeavor, the Defendant Officers unlawfully suppressed information that would have implicated others and thereby exonerate Mr. Virgil.

53.     In fact, from the very beginning, the circumstantial evidence in this case pointed to other persons as the likely murderer(s) of Ms. Welch.  Unfortunately for Mr. Virgil, Defendant Officers withheld this evidence from him both prior to and after his conviction.

### The Newport Defendant Officers Withheld Exculpatory Information
### Relating to Alternate Suspect Isaac Grubbs

54.     On April 11, 1987, the Newport police officers, including certain of the Defendant Officers, were dispatched to 932 Columbia Street in Newport, Kentucky for an unrelated crime.

55.     Upon their arrival, Isaac Grubbs, a white male, confronted the officers with a butcher knife.  Mr. Grubbs lunged at the Newport police officers multiple times prior to the officers using deadly force against him.

56.     An internal investigation immediately ensued into the use of force against Mr. Grubbs by the Newport Police Department.  That investigation was conducted by the Newport Defendant Officers and led by Defendants Brandt and Wagner, both of whom also served as lead investigators on the Welch homicide.

57.     The Newport Defendants began their investigation by collecting three pieces of physical evidence, including the butcher knife wielded by Mr. Grubbs before he was shot dead by the police.  This physical evidence, including the knife, was transported to the Newport Police Department.

58.     Prior to Mr. Virgil's wrongful conviction, the Newport Defendants learned that on April 11, 1987, Mr. Grubbs had argued with Ms. Welch by telephone for nearly fifteen minutes before threatening to kill her.  The Newport Defendants were further informed that Grubbs was carrying a large knife at the time that he threatened Ms. Welch by phone.

59.     Around this same time, the Newport Defendants also learned from a separate witness interviewed another witness that on April 11, 1987, Mr. Grubbs

was seen wiping down a pink Cadillac with a white rag or towel near the courthouse in Northern Kentucky - the same type and color of vehicle owned by Ms. Welch (whose car was eventually recovered parked by the very same courthouse). According to this witness, once Ms. Grubbs was done wiping the car down, he threw the rag or towel into the back seat area of the car and then looked around suspiciously before fleeing the area.

60.    The Newport Defendants conducted a further investigation into Mr. Grubbs for the murder of Ms. Welch.  None of the potentially exculpatory information from that investigation was shared with Mr. Virgil, his counsel, or the prosecutors assigned to his case.  Indeed, the Newport Defendants concealed all documents relating to their investigation of Mr. Grubbs despite the fact that these documents clearly pointed to a potential alternate suspect.

### The Newport Defendant Officers Withheld Exculpatory Information Relating to Alternate Suspect James Becker

61.    Within days of Retha Welch being murdered, the Newport Defendants learned not only that Ms. Welch had separated from James Becker, her onetime boyfriend, just weeks before she was killed, but that Mr. Becker had stolen a significant amount of money from Ms. Welch just prior to her death, and that shortly after her death Mr. Becker had inquired with a neighbor of Ms. Welch about whether or not police officers had recovered a pink jacket that belonged to Ms. Welch and was ultimately recovered next to her murdered body.

62.     That Mr. Becker was considered a prime suspect by the Newport Defendants is perhaps best demonstrated by the fact that they obtained blood, hair, and saliva samples from him, as well as had him undertake a polygraph exam.

63.     As with Mr. Grubbs, none of this potentially exculpatory information was disclosed to Mr. Virgil, his counsel, or the prosecutors on his case prior to his trial.

### The Newport Defendant Officers Withheld Exculpatory Information Relating to Alternate Suspects Richard Mays and Robin Letzo

64.     On April 13, 1987, the Newport Defendants interviewed two witnesses who provided them with significant information that implicated Richard Mays and Robin Letzo in the murder of Ms. Welch.

65.     According to one of these witnesses – a woman who had previously been in a relationship with Mr. Mays – Mr. Mays and his friend Mr. Letzo had traveled to Newport on April 10, 1987, just days prior to the murder of Ms. Welch, in order to "get" a person who had allegedly stolen thousands of dollars from him. More important, this same witness informed the Newport Defendants that on April 12, 1987 Mr. Mays informed her that he had learned about "a Newport woman who had worked at the Dew Drop Inn (as Ms. Welch did) being stabbed 17 times."  Mr. Mays then informed this same witness that he and Mr. Letzo were going to leave town the very next day.

66.     Crucially, on April 12, 1987, the day that Mr. Mays revealed this information related to the stabbing murder of a Newport woman, Ms. Welch had not yet been declared missing or found dead.  As such, this was information that only

Ms. Welch's killer would have been aware of as Ms. Welch's body was not discovered until the following day.

67.    Subsequent to receiving this information, the Newport Defendants further learned that Mr. Letzo had been previously convicted of murder, but had been released due to mental health issues.

68.    Following up on these important leads, Defendant Wagner visited the Days Inn with other Newport Defendants where he confirmed that Letzo had rented a room there on April 10 but had abandoned the room very shortly after the murder of Ms. Welch.

69.    As with Mr. Grubbs and Mr. Becker, none of this potentially exculpatory information was disclosed to Mr. Virgil, his counsel, or the prosecutors on his case prior to his trial.

### The Newport Defendant Officers Withheld Exculpatory Information Relating to Additional Alternate Suspects

70.    In addition to withholding exculpatory information relating to suspects Grubbs, Becker, Mays, and Letzo, the Newport Defendants withheld exculpatory information relating to additional potential alternate suspects in the murder of Ms. Welch.

71.    For example, on April 14, 1987, Defendant Page received information from an anonymous caller informing him that Ms. Welch had been seen on Thursday, April 9 with a black male walking near the Krogers grocery store in Covington, Kentucky before driving away with Ms. Welch in her Cadillac. According to the caller, Ms. Welch was assisting this person with finding

employment after serving 10-20 years for a murder conviction.  Mr. Virgil had never been convicted of murder prior to being wrongfully convicted in this case.

72.    Additionally, during his canvas of the apartment complex where Ms. Welch lived, Defendant Wagner learned that on April 11, 1987 Ms. Welch was observed in the presence of a six foot tall white male with broad shoulders who was working on Ms. Welch's vehicle in the parking lot of her residence.

73.    No information related to these potential suspects was shared with Mr. Virgil, his counsel, or the prosecutors on his case prior to his trial.

### The Newport Defendant Officers, Cincinnati Defendant Officers, and the Norwood Defendant Officers Withheld Exculpatory Information Relating to a Suspected Serial Killer

74.    The Newport Defendant Officers were in frequent contact with members of the Norwood Police Department and the Cincinnati Police Department relating to the investigation into the murder of Ms. Welch.  Indeed, the Defendant Officers from all three departments conducted a joint investigation into the murder of Ms. Welch and other similar unsolved area homicides.

75.    This joint investigation was initiated when the Newport Defendant Officers learned that officers from the Norwood Police Department and from the Cincinnati Police Department were investigating their own murder cases with key similarities to the Welch homicide.

76.    As part of this joint investigation, the Defendant Officers met on a number of occasions with the purpose of developing theories of the murders and

identifying alternate suspects, including their suspicion that a serial killer may have been responsible for all three murders.

77.     None of this information, including information related to and derived from the joint investigation for all three unsolved murders, was shared with Mr. Virgil, his counsel, or the prosecutors on his case prior to his trial.

### Mr. Virgil's Wrongful Prosecution

78.     On April 23, 1987, less than ten days after Ms. Welch's murdered body was found, Mr. Virgil was arrested for her murder.

79.     In October 1988, Defendant Wagner appeared before the Campbell County Grand Jury and testified falsely about his interactions with Joe Womack. Defendant Wagner was aware that Womack had been coerced into falsely implicating Mr. Virgil.  Defendants Brandt, Neimeir, and Sears also provided false testimony to the grand jury in order to initiate charges against Mr. Virgil for the murder of Ms. Welch.

80.     The Defendant Officers knew that the witness statements used to initiate these charges against Mr. Virgil were fabricated, false, and/or the product of coercion.  Even still, the Defendant Officers used these statements to falsely initiate charges against Mr. Virgil.

81.     On the basis of Defendants' Officers fabricated evidence, which Defendant Officers concealed from Mr. Virgil, his counsel, and the prosecutors on his case, the case proceeded to trial in 1988.

82.     As indicated above, some of the most damning evidence at trial against Mr. Virgil was the false and coerced testimony of Mr. Womack who testified at length that Mr. Virgil had confessed to the murder while they were housed together at Lebanon Correctional Institution.

83.     Following a jury trial, Mr. Virgil was convicted of the murder of Ms. Welch and sentenced to 70 years in prison.

## Mr. Virgil's Vindication

84.     For 28 years the Defendant Officers contrived to frame Mr. Virgil for the murder of Retha Welch.  Ultimately, the Commonwealth agreed that Mr. Virgil's wrongful conviction should be reversed and that he deserved a new trial.

85.     On December 18, 2015, the Court ordered that Mr. Virgil be granted a new trial. Mr. Virgil was released into the loving arms of his close family and friends shortly thereafter.

## Newport Defendants' Pattern and Practice of Misconduct In Order to Secure Wrongful Prosecutions and Convictions

86.     The Defendant Officers' misconduct in this case was not an isolated occurrence.

87.     Rather, the City of Newport, by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques by Newport Police Department ("NPD") officers, including but not limited to:

    a.  conducting impermissibly suggestive witness identification procedures;

    b.  fabricating evidence;

    c.  coercing witnesses into providing false statements;

    d.  failing to promptly document and disclose material, exculpatory and impeachment evidence to prosecutors;

    e.  failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations;

    f.  engaging in the ongoing affirmative concealment and cover-up of police misconduct; and/or

88.    The municipal defendants, by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of failing to adequately train, supervise, and discipline NPD officers in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to:

    a.  conducting witness identification procedures;

    b.  maintaining physical evidence and accurately documenting investigative work;

    c.  documenting and promptly disclosing exculpatory and impeachment evidence to prosecutors; and/or

    d.  conducting constitutionally adequate investigations with objectivity rather than tunnel vision.

89.    As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence within the NPD. In accordance with this code, police detectives refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

90.    As a result of the municipal defendants' established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct; failing to investigate cases in which the police are implicated in obtaining wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the NPD, certain NPD police officers (including the Newport Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.  As a result of these policies and practices of the municipal defendants, members of the NPD act with impunity when they violate the constitutional and civil rights of citizens.

91.    The municipal defendants' failure to train, supervise, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Newport Defendants committed against Plaintiff in this case.  Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the municipal defendants' practices and *de facto* policies, as alleged above.

92.     The municipal defendants and officials within the NPD failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.  They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Mr. Virgil's ongoing injuries.

93.     The policies and practices described in the foregoing paragraphs were consciously approved by the municipal defendants' policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

### Cincinnati Defendants' Pattern and Practice of Misconduct
### In Order to Secure Wrongful Prosecutions and Convictions

94.     The Defendant Officers' misconduct in this case was not an isolated occurrence.

95.     Rather, the City of Cincinnati, by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques by Cincinnati Police Department ("CPD") officers, including but not limited to:

   a.  conducting impermissibly suggestive witness identification procedures;

   b.  fabricating evidence;

   c.  coercing witnesses into providing false statements;

   d.  failing to promptly document and disclose material, exculpatory and impeachment evidence to prosecutors;

e.  failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations;

f.  engaging in the ongoing affirmative concealment and cover-up of police misconduct; and/or

96.  The municipal defendants, by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of failing to adequately train, supervise, and discipline CPD officers in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to:

a.  conducting witness identification procedures;

b.  maintaining physical evidence and accurately documenting investigative work;

c.  documenting and promptly disclosing exculpatory and impeachment evidence to prosecutors; and/or

d.  conducting constitutionally adequate investigations with objectivity rather than tunnel vision.

97.  As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence within the CPD. In accordance with this code, police detectives refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

98.     As a result of the municipal defendants' established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct; failing to investigate cases in which the police are implicated in obtaining wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the CPD, certain CPD police officers (including the Cincinnati Defendant Officers here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.  As a result of these policies and practices of the municipal defendants, members of the CPD act with impunity when they violate the constitutional and civil rights of citizens.

99.     As an example, in 1982, pursuant to these unconstitutional customs and practices, CPD officers – wrongly arrested, maliciously prosecuted, and covered up or withheld exculpatory and impeachment information from another innocent suspect, Randall Ayers, who was wrongfully convicted of a crime he did not commit. Mr. Ayers suffered eight years in prison before he was finally exonerated.  Mr. Ayers experienced many of the same types of misconduct that led to Mr. Virgil's wrongful conviction.

100.     Additionally, in 1985, pursuant to these unconstitutional customs and practices, CPD officers – wrongly arrested, maliciously prosecuted and covered up or withheld exculpatory and impeachment information from another innocent suspect, Derrick Jamison, who was wrongfully convicted of a crime he did not

commit. Mr. Jamison suffered twenty years in prison before he was finally exonerated. Mr. Jamison experienced many of the same types of misconduct that led to Mr. Virgil's wrongful conviction.

101. The municipal defendants' failure to train, supervise, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Cincinnati Defendant Officers committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the municipal defendants' practices and **de facto** policies, as alleged above.

102. The municipal defendants and officials within the CPD failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Mr. Virgil's ongoing injuries.

103. The policies and practices described in the foregoing paragraphs were consciously approved by the municipal defendants' policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

### Plaintiff's Damages

104. William Virgil spent more than 28-years incarcerated for crimes he did not commit. He must now attempt to make a life for himself without the benefit of nearly a decade of life experiences, which normally equip adults for that task.

105. Additionally, the emotional pain and suffering caused by losing those years has been substantial. During his incarceration, he was stripped of the

various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  Mr. Virgil missed out on the ability to share holidays, births, funerals, and other life events with loved ones, to raise his five children, the opportunity to fall in love, to marry, and the fundamental freedom to live one's life as an autonomous human being.

106.    As a result of the foregoing, Mr. Virgil has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct.

## Count I - 42 U.S.C. § 1983
## Due Process

107.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

108.    As described more fully above, all of the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Virgil of his constitutional right to a fair trial.

109.    In the manner described more fully above, the Defendants conducted a reckless investigation, deliberately withheld exculpatory evidence, and fabricated false reports, false testimony, and other evidence.  Absent this misconduct, the prosecution of Mr. Virgil could not and would not have been pursued.

110.    The Defendants' misconduct also directly resulted in the unjust criminal conviction of Mr. Virgil, thereby denying him his constitutional right to a

fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

111.    As a result of this violation of his constitutional right to a fair trial, Mr. Virgil suffered injuries including but not limited to emotional distress, as is more fully alleged above.

112.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Virgil's constitutional rights.

113.    The misconduct described in this Count was undertaken pursuant to a routine practice of the CPD and NPD to pursue wrongful convictions through reckless and profoundly flawed investigations and coerced evidence.  In this way, the municipal defendants violated Mr. Virgil's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

114.    These widespread practices, so well-settled as to constitute de facto policy in the CPD and NPD, were able to exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to the problem, thereby effectively ratifying it.

115.    The widespread practices described in the preceding paragraphs were allowed to flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

## Count II – 42 U.S.C. § 1983
## Malicious Prosecution

116.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

117.    As described more fully above, all of the Defendant Officers, while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Virgil of his constitutional right to be free from unlawful prosecution and continued detention without probable cause.

118.    In the manner described more fully above, the Defendant Officers made, influenced and/or participated in the decision to prosecute Mr. Virgil for murder, for which prosecution there was no probable cause and which caused Mr. Virgil to suffer a deprivation of liberty.  Their misconduct included falsifying evidence and withholding exculpatory and impeachment evidence.

119.    As described more fully above, the prosecution was resolved in Mr. Virgil's favor.

120.    The Defendant Officers' misconduct directly resulted in the unlawful prosecution and continued deprivation of Mr. Virgil's liberty in violation of his constitutional rights.

121.    As a result of this violation of his constitutional rights, Mr. Virgil suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

122.    The Defendant Officers' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Mr. Virgil's constitutional rights.

123.    The misconduct described in this Count was undertaken pursuant to a routine practice of the CPD and NPD to pursue wrongful prosecutions and wrongful convictions through reckless and profoundly flawed investigations and coerced evidence.  In this way, the municipal defendants violated Mr. Virgil's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

124.    These widespread practices, so well-settled so as to constitute *de facto* policy in the CPD and NPD, were able to exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to the problem, thereby effectively ratifying it.

125.    The widespread practices described in the preceding paragraphs were allowed to flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

## Count III – 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
## Fabrication of False Evidence

126.    Each paragraph of this Complaint is incorporated as if restated fully herein.

127.    In the manner described more fully above, the Defendant Officers, individually, jointly and in conspiracy with each other, fabricated evidence, including without limitation, false police reports, fabricated statements attributed

to witnesses, and fabricated testimony offered at grand jury and other pretrial proceedings.  The Defendant Officers knowingly fabricated this evidence and a reasonable likelihood exists that the false evidence affected the decision of the grand jurors and courts that considered this false evidence when determining whether probable cause existed.

128.    The Defendant Officers were acting under color of law and within their scope of employment when they took these actions.

129.    The Defendant Officers' misconduct directly resulted in the unjust continued incarceration of Plaintiff, thereby denying him from his constitutional right to due process as guaranteed by the U.S. Constitution.  Absent this misconduct, there would have been no probable cause for Plaintiff's continued detention, and the prosecution of Plaintiff could not and would not have been pursued.

130.    As a direct and proximate result of the Defendant Officers' actions, Plaintiff's constitutional rights were violated and he suffered from injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count IV – 42 U.S.C. § 1983
### Supervisory Liability Against Newport Defendants

131.    Each paragraph of this Complaint is incorporated as if restated fully herein.

132.   The continued wrongful detention of Plaintiff was caused by the deliberate indifference and recklessness of supervisory defendants, including but not limited to Defendants Sears, Fromme, and Page, when they failed to adequately train and supervise the individual Newport Defendant Officers.

133.   Specifically, these supervisory defendants were personally involved in the case against Plaintiff and knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

134.   Furthermore, these supervisory defendants failed to supervise the Defendant Officers in constitutionally adequate law enforcement practices, particularly those which concerned interviews of suspects and the production of exculpatory evidence, thereby encouraging and/or permitting these employees and other defendants to engage in a reckless investigation, to coerce and fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Plaintiff.

135.   These interview techniques, failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement agencies.  The fact that the defendant supervisors failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Plaintiff's constitutional rights.

136.    The personal involvement of the defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

137.    The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights.

### Count V - 42 U.S.C. § 1983
### Failure to Intervene

138.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

139.    In the manner described above, during the constitutional violations described above, one or more of the Defendant Officers stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

140.    As a result of the Defendant Officers failure to intervene to prevent the violation of Mr. Virgil's constitutional rights, Mr. Virgil suffered pain and injury, as well as emotional distress.

141.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Virgil's rights.

142.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the CPD and NPD in the manner described more fully in

the preceding paragraphs, and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

**Count VI**
**42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights**

143.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

144.    After Ms. Welch was murdered, the Defendant Officers reached an agreement amongst themselves to frame Mr. Virgil for the crime, and to thereby deprive Mr. Virgil of his constitutional rights and his liberty to be continuously taken away from him, all as described in the various Paragraphs of this Complaint.

145.    In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

146.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

147.    As a direct and proximate result of the illicit prior agreement referenced above, Mr. Virgil's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

148.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

149.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the CPD and NPD in the manner described more fully in

31

the preceding paragraphs, and was tacitly ratified by policymakers for the

municipal defendants with final policymaking authority.

**Count VII - 42 U.S.C. § 1983**
***Monell* Claim Against Defendant City of Newport**

150.    Each of the Paragraphs of this Complaint is incorporated as if restated

fully herein.

151.    The actions of NPD officers in withholding material exculpatory

information from Mr. Virgil and his counsel were undertaken pursuant to the

policies and practices of the NPD, described above, which were ratified by

policymakers for the City of Newport with final policymaking authority.  These

policies and practices included the failure to adequately train, supervise, and

discipline officers on the requirements concerning the prompt disclosure of newly

discovered evidence that exonerates a defendant following his arrest or conviction.

152.    The policies and practices described in this Count were maintained

and implemented by the City of Newport with deliberate indifference to Plaintiff's

constitutional rights.

153.    As a direct and proximate result of the City of Newport's actions,

Plaintiff's constitutional rights were violated and he suffered injuries and damages,

as set forth in this Complaint.

154.    The City of Newport is therefore liable for the misconduct committed

by its officers.

## Count VIII - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant City of Cincinnati

155.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

156.    The actions of CPD officers in withholding material exculpatory information from Mr. Virgil and his counsel were undertaken pursuant to the policies and practices of the CPD, described above, which were ratified by policymakers for the City of Cincinnati with final policymaking authority.  These policies and practices included the failure to adequately train, supervise, and discipline officers on the requirements concerning the prompt disclosure of newly discovered evidence that exonerates a defendant following his arrest or conviction.

157.    The policies and practices described in this Count were maintained and implemented by the City of Cincinnati with deliberate indifference to Plaintiff's constitutional rights.

158.    As a direct and proximate result of the City of Cincinnati's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

159.    The City of Cincinnati is therefore liable for the misconduct committed by its officers.

## Count IX – State Law Claim
### Negligent Supervision

160.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

161.   The municipal defendants, as well as the supervisory defendants Fromme, Page, and Sears had a duty to properly train and supervise officers, detectives, and supervisor employees of the NPD, and to provide adequate policies to prevent the above conduct, including fabricating evidence, fabricating witness statements, and concealing material impeachment evidence.

162.   The municipal defendants and the supervisory defendants were grossly negligent and negligent in the training, supervision and discipline of the Defendant Officers, resulting in Mr. Virgil being deprived of his right to due process, and his right to be free from false arrest, false imprisonment, and wrongful conviction.

163.   As a result of this misconduct, Mr. Virgil suffered injuries, including bodily harm and emotional pain and suffering as more fully alleged above.

### Count X – State Law Claim
### Intentional Infliction of Emotional Distress

164.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

165.   As described more fully in the preceding paragraphs, by framing Mr. Virgil for a murder he did not commit, the Defendant Officers intended to cause emotional distress, or knew or should have known that their actions would result in serious emotional distress.

166.   In doing so, the Defendant Officers' conduct was extreme and outrageous, going beyond all possible bounds of decency such that it can be considered completely intolerable in a civilized society, and this conduct caused Mr.

Virgil to suffer serious emotional distress of the nature no reasonable man could be expected to endure.

167.   The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Defendant Officers within the scope of their employment.

168.   As a result of this misconduct, Mr. Virgil sustained injuries, including emotional pain and suffering, as is more fully alleged above.

**Count XI**
**Respondeat Superior**

169.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

170.   In committing the acts alleged in the preceding paragraphs, the Defendant Officers were members and agents of the Cincinnati Police Department, Norwood Police Department and the Newport Police Department, acting at all relevant times within the scope of their employment.

171.   Defendants City of Newport, City of Norwood, and City of Cincinnati are liable as principals for all state law torts committed by their agents.


WHEREFORE, Plaintiff, WILLIAM VIRGIL, respectfully requests that this Court enter judgment in his favor and against Defendants Defendants CITY OF NEWPORT, CITY OF CINCINATTI, Newport Police Officers MARC BRANDT, NORM WAGNER, PAT MOORE, HOWARD NEIMEIER, SARAH DESENTRY, SGT. BRADFORD, Newport Police Lieutenants RICK SEARS, TOM FROMME, and

KEN PAGE, Cincinnati Police Officers MIKE SLAYBACK, ROBERT CARDONE, and MIKE PHILLIPS, Norwood Police Officer STEVE DANIELS, and other unknown officers from the Newport, Cincinnati, and Norwood Police Departments awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

### JURY DEMAND

Plaintiff, WILLIAM VIRGIL, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.


Respectfully submitted,

/s/ Elliot Slosar
One of Plaintiff's Attorneys


Arthur Loevy
Jon Loevy
Michael Kanovitz
Vince Field
Elliot Slosar
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
Fax: (312) 243-5902