**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

CIVIL ACTION NO. 16-224-DLB-EBA

WILLIAM VIRGIL                                                                              PLAINTIFF

v.                              <u>MEMORANDUM OPINION AND ORDER</u>

CITY OF NEWPORT, et al.                                                       DEFENDANTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

        In 2016, the discovery of DNA evidence convinced a Kentucky court to vacate
William Virgil's 1988 murder conviction.  Shortly thereafter, a grand jury declined to
reindict Virgil, leading to his release after twenty-eight years' incarceration.  Following his
release from prison, Virgil sued many of the detectives who investigated his case,
asserting that they fabricated inculpatory evidence, withheld exculpatory evidence, and
participated in Virgil's prosecution without probable cause.  (Doc. # 49-1).  Virgil also
brings claims against the municipalities that employed those detectives, including the
cities of Newport, Norwood, and Cincinnati.  (*Id.*).  After extensive discovery, Newport
Police Officers Marc Brandt, Norman Wagner, Pat Moore, Howard Niemeier, Robert
Bradford, Ken Page, Tom Fromme, and Rick Sears (collectively, the "Individual Newport
Defendants") have moved for summary judgment.  (Doc. # 212).  The remaining
Defendants, namely the Cities of Newport, Cincinnati, and Norwood, as well as the
individual Norwood and Cincinnati police officers, have likewise moved for summary
judgment.  (Docs. # 215, 216, and 223).  These Motions have been fully briefed, (*see*

Docs. # 234, 251, 252, 257, and 263), and oral argument on the motions was conducted on June 9, 2021, (Doc. # 291). The Motions are therefore ripe for the Court's review.

As set forth below, summary judgment is warranted for all the Individual Newport Defendants except for Marc Brandt and Norman Wagner, who the record shows may have withheld exculpatory evidence relating to alternate suspects and pretrial payments to a witness. Further, the record demonstrates a genuine issue of material fact as to whether Brandt's and Wagner's alleged due process violations resulted from Newport's knowing or reckless failure to train. Accordingly, the Individual Newport Defendants' Motion for Summary Judgment is **granted in part and denied in part** and the City of Newport's Motion for Summary Judgment is **denied in relevant part**. In addition, because Cincinnati and Norwood police officers had no duty to disclose evidence favorable to Virgil, those Officers' Motions for Summary Judgment are **granted**. There being no violation by their individual officers, the City of Norwood's and City of Cincinnati's Motions for Summary Judgment are also **granted**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On April 13, 1987, fifty-four-year-old Retha Welch, a psychiatric nurse in Cincinnati, was found raped and murdered in the bathroom of her home in Newport, Kentucky. (Doc. # 234-4 at 2-5). An autopsy revealed that Welch had suffered twenty-eight knife wounds as well as blunt force trauma to the head. (*Id.* at 6, 27). The coroner estimated that Welch had been dead for at least twelve hours but no more than one week from the time her body was discovered. (Doc. # 212-3 at 972). Welch's downstairs neighbor, Richard Beal, reported that he had heard what sounded like footsteps coming

from Welch's apartment on the morning of April 11th, two days before the discovery of Welch's body. (Docs. # 212-3 at 1196 and 263-7).

Defendant Marc Brandt of the Newport Police Department led the investigation into Welch's homicide until May 15, 1987, when he left the police force to work in the private sector. (Doc. # 234-3 at 191). Brandt was assisted by Defendant Norman Wagner, who took over as lead detective when Brandt resigned. (Doc. # 234-7 at 20-21). Brandt and Wagner were both supervised by Defendant Rick Sears. (Doc. # 238-1 at 91). Sears became the lead investigator in the Welch case after Wagner later resigned in December 1987. (*Id.* at 56-57).

During their investigation, Newport police officers gathered sixty-six pieces of physical evidence from the crime scene, including hair and blood samples, a bloody envelope, and a cigarette butt found in the toilet. (Docs. # 212-3 at 371, 430, 234-4 at 188, and 234-5 at 146.). Officers also dusted for fingerprints and photographed a partial bloody footprint found on the ceramic tile in Welch's bathroom. (Docs. # 212-1 at 18 and 234-4 at 190). Detectives noted that gold jewelry had been taken from the apartment and that Welch's pink Cadillac was missing. (Doc. # 234-4 at 292, 300). Welch's car was discovered the following day parked on the street near the state courthouse in Covington, Kentucky. (*Id.* at 17).

Shortly after Welch's death, Newport Police learned that she had taken part in a jail ministry program and had become acquainted with a number of convicts, including Plaintiff William Virgil. (Doc. # 234-5 at 153). Welch had assisted Virgil since his release from prison in January 1987 by securing him a room at Tender Mercies (a halfway house in Cincinnati) and assisting him with tasks such as laundering clothes. (*Id.* at 39, 157).

Defendant Marc Brandt interviewed Virgil on April 17, 1987 in the Hamilton County Jail, where Virgil was being held for a recent parole violation. (Doc. # 212-1 at 36). During the interview, Virgil initially lied about having gone to Kentucky to see Welch, which may have been explained by Virgil's desire to hide the fact that he had violated his parole by leaving Ohio without permission. (*Id.* at 38). Virgil later admitted to having visited Welch's apartment and stated that the two had been in a romantic relationship that broke off in February. (*Id.* at 38-39). While questioning Virgil, Brandt noticed that the tread pattern on Virgil's shoe was similar to the one seen at the Welch crime scene. (*Id.* at 39). Brandt sent the shoes to the Kentucky State Police for testing, but the results were inconclusive. (Doc. # 212-3 at 902, 918).

James Becker was Welch's recent boyfriend and the last known person to have seen Welch alive. (Doc. # 234-4 at 299). Becker told Brandt that he and Welch spent the night together on April 8th and that the two had sex on April 9, 1987. (Doc. # 234-5 at 117). While visiting with Welch on April 9th, Becker remembered seeing a black man wearing a gray sweatsuit in the hallway of Welch's apartment sometime around 9:15 p.m. (*Id.* at 119-120, 146). Welch purportedly told Becker a few minutes later that the man was recently out of prison and that she would allow him to spend the night. (*Id.* at 122). This upset Becker, and he and Welch argued. (*Id.* at 122-123). Welch proceeded to accompany Becker back to his apartment, where she retrieved several bottles of alcohol and went back to her apartment soon thereafter around 10:00 p.m. (*Id.* at 123, 125).

On April 13, 1987, Defendants Sears and Howard Niemeier (a patrol officer) presented Becker a photo lineup (which Plaintiff asserts was unduly suggestive), during which Becker tentatively identified Virgil as the man he saw at Welch's apartment on the

night of April 9, 1987. (Doc. # 234-4 at 288). Becker's identification was partially corroborated by Virgil's friend, Mary Bush, who told officers that Virgil had appeared at her home at around 11:30 p.m. on April 9th in a gray sweatsuit similar to the one Becker had described. (*Id.* at 49). However, another of Virgil's friends, Karen Oglesby, stated in an interview with police on April 18th that Virgil had been at her house in Cincinnati at "maybe 8 or 9" in the evening on April 9th, around the time Becker purportedly saw Virgil at Welch's apartment. (Doc. # 234-6 at 55).

On April 21, 1987, Defendant Wagner interviewed Welch's friend and colleague, Melveena McCollum. (Doc. # 234-5 at 152). McCollum had joined Welch in ministering inmates at local prisons and had met Virgil during a prison visit with Welch. (*Id.* at 153, 156). McCollum relayed that Welch had suspected Virgil of stealing her credit card when he had come over to her apartment in February 1987. (*Id.* at 155). McCollum also stated that Virgil had tried to kiss Welch and that Welch "didn't like it," but that as far as she knew, it was an "isolated incident" and not a "continuing problem." (*Id.*). There was additional evidence of conflict between Welch and Virgil. For example, Kathleen Lenz, the director of Tender Mercies, stated that Virgil had wanted a romantic relationship with Welch and that it "was a struggle." (*Id.* at 39). Virgil's probation officer, Tracy Pomerleau, also noted to police that it was a "big concern" that "Welch kept being hit on." (*Id.* at 40).

Also on April 21st, Officers Brandt and Wagner interviewed Virgil's former girlfriend, Sue Daniels, who at the time was a patient at Rollman's Psychiatric Institute. (*Id.* at 160-161). Daniels told detectives in a recorded statement that in early February 1987, Virgil had asked her to assist him in murdering Welch by slitting her throat. (*Id.* at 161-162). As part of the murder plot, Virgil had purportedly informed Daniels of his intent

to steal Welch's car and other personal property and flee to New York. (*Id.* at 162). According to Daniels, Virgil had already stolen Welch's credit card to fund his cocaine addiction. (*Id.* at 163). The next day, Brandt and Wagner heard from Daniels' probation officer that Daniels had approached him in early February 1987 about a boyfriend who had asked for her assistance in committing a murder. (*Id.* at 175).

Equipped with these facts, Officer Brandt on April 23, 1987 filed a criminal complaint in Campbell District Court, charging Virgil with Welch's murder. (Docs. # 234-3 at 144 and 234-5 at 178). Six days later, another of Virgil's girlfriends, Betty Kelow, told Brandt and Wagner that Virgil had also asked her to assist him in murdering Welch. (Doc. # 234-5 at 204). According to Kelow, Virgil wanted to murder Welch because she had threatened to report to his parole officer that he had stolen her credit card. (*Id.*). Kelow further stated that Virgil had made purchases with Welch's credit card at several stores, including Greco's clothing store. (*Id.* at 206-207). Newport officers had previously learned from Welch's credit union that someone had put an unauthorized charge on Welch's card at Greco's. (*Id.* at 46-47).

On May 11, 1987, the Kentucky State Police issued a report on the forensic evidence collected in the Welch case, much of which turned out to be inconclusive or favorable to Virgil. For example, the blood found on Virgil's shoe and sweatshirt was too limited in quantity to test serologically. (Doc. # 234-4 at 198-199). Also, serology testing of semen recovered from Welch's apartment either excluded Virgil as a contributor or was inconclusive. (*Id.* at 199). In particular, Virgil was found not to be a contributor of the semen found on the vaginal and rectal swabs taken from Welch. (*Id.*). Although some of the hairs recovered from Welch's apartment were determined to be similar to Virgil's, and

Virgil's fingerprints were found on Welch's lamp, these facts had little significance given that hair and fingerprints could not be dated, and Virgil was known to have entered Welch's apartment in February. (*Id.* at 200).

The Newport Police Department identified other suspects in addition to Virgil. James Becker was one. (Docs. # 212-3 at 1158, 234-3 at 32, and 234-7 at 177). Another was a man by the name of Isaac Grubbs, who was shot and killed in a standoff with Newport police officers on the night of April 11, 1987. Officer Brandt received a tip from Karen Walling, who stated in a phone conversation that she had seen a man fitting Grubbs' description at a lake house where she worked in Southgate, Kentucky. (Docs. # 212-3 at 1140-1141, 1154 and 234-3 at 64). Brandt apparently did not document the contents of his phone conversation with Walling, but Walling provided significant detail about her encounter with the man at the pay lake in her testimony at Virgil's trial. Walling testified that she had been afraid of the man because he had acted erratically and smelled of alcohol.[1] (Doc. # 212-3 at 1140-1141). The man sought use of Walling's phone and provided a phone number for her to dial. Walling dialed the number and heard a woman answer before handing over the phone to the man. (*Id.* at 1144-1145, 1152-1153). The man proceeded to argue with the woman on the phone. (*Id.* at 1146-1147). Later that evening, Walling recognized the man she saw as Isaac Grubbs when she watched the

---

[1] At trial, Walling suggested that her description to police of the encounter with Grubbs was far less detailed, stating that "[a]ll that I told [the police] was that Mr.- the fellow that was on the stretcher that died Saturday night was fishing at my lake and that he had me dial this lady's phone number." (Doc. # 212-3 at 1158). Another part of Walling's testimony suggested otherwise, however, (*see id.* at 1160), and Brandt during his deposition testimony admitted that Walling had provided substantial detail regarding her encounter with Grubbs. (Doc. # 234-3 at 68-71, 74). Out of an abundance of caution and construing the facts in the light most favorable to Virgil, it will be assumed that Officer Brandt in his conversation with Walling was informed of the important facts, including the nature of Grubbs' appearance and his angry tone of voice on the phone call.

news report of Grubbs' killing by police. (*Id.* at 1156). After learning of Welch's death a few days later, Walling checked Welch's number in the phone book and recalled that it matched the one she had dialed for Grubbs days earlier. (*Id.* at 1183).

Police received additional information that Plaintiff says further implicated Grubbs in the crime. First, Welch's downstairs neighbor, Richard Beal, reported that he went for a run around 12:40 p.m. on April 11th and saw Welch's pink Cadillac being driven in the parking lot by a male subject "he thought was white" but whose face he could not see. (Doc. # 263-7). The driver was wearing a plaid shirt or coat. (*Id.*). Grubbs, a white male, was seen by Walling wearing a plaid shirt later that day. (Doc. # 212-3 at 1154). Second, sometime in May 1987, a person by the name of Brian Cave told Newport Police that when sitting at a bus stop near the Covington courthouse on April 11, 1987, he saw a man fitting Grubbs' description park a pink Cadillac across the street.[2] (Doc. # 234-30 at 13-15). Cave witnessed the man wipe down surfaces in the car for five to ten minutes before exiting the car and closing the door without using his hands. (*Id.* at 14-15).

Newport Police were also investigating the possibility that Welch's murder was connected to two other murders committed around the same time in the Cincinnati area. To that end, Officers Brandt and Wagner participated in a number of meetings and discussions with Officers from the Cincinnati and Norwood Police Departments, both of which also considered Virgil a suspect in their homicide cases. (Docs. # 234-21 at 59,

---

[2]     The record is unclear as to when Cave reported these facts to police. In his deposition, Cave stated that he did not alert police until after he had met Virgil in the local jail in May 1988, over a year after Virgil was charged. (Doc. # 234-30 at 26-28). But Wagner in his deposition testified to knowing Cave's tip as early as April 1987. (Doc. # 234-7 at 338). Plaintiff in his brief asserts that "[i]n May 1987, Brian Cave informed the Commonwealth that he had seen a man— later identified as Isaac Grubbs—wiping down Welch's Cadillac outside the courthouse on Saturday, April 11, 1987." (Doc. # 234 at 146). Following Plaintiff's lead, the Court will assume that Wagner first learned of Cave's tip in May 1987.

234-22 at 275, and 236-3 at 115).  Virgil was later cleared in these other homicides and the Newport Police eventually concluded that the homicides were unrelated.  (Doc. # 234-3 at 148 and 234-22 at 281).

On September 18, 1987, Wagner obtained a recorded statement from Joe Womack, a prisoner at the Lebanon Correctional Institute in Ohio.  Womack informed Wagner that he had shared a cell with Virgil in August 1987 and that Virgil had confessed to murdering a woman in Kentucky.  (Doc. # 234-6 at 99-100).  Womack provided several details about the murder that were corroborated by facts gathered in the investigation.  For instance, Womack recounted Virgil's statement that he had stabbed the victim multiple times and hit her over the head before carrying her from the kitchen to the bathtub.  (*Id.* at 100).  Womack also correctly stated that Virgil had received clothes from the victim upon his release from the hospital.  (*Id.* at 99).

In October 1987, Virgil's case was brought before a grand jury in Campbell County, Kentucky.  At the grand jury, prosecutor Houston ("Hoot") Ebert presented testimony from Officer Brandt, Officer Wagner, Lieutenant Sears, Officer Niemeier, James Becker, Sue Daniels, Joe Womack, various forensic experts, and others.  (Doc. # 212-1 at 1-2).  Although Betty Kelow did not testify, Officer Brandt informed the grand jury about the substance of her recorded statement in which she asserted that Virgil asked her to help kill Welch.  (*Id.* at 67-69).  At the conclusion of testimony, the grand jury indicted Virgil with murder.  (Doc. # 212-54).

Virgil's trial took place in September 1988.  During closing argument, the prosecution argued that the circumstantial evidence was sufficient to return a jury verdict.  This evidence included (1) Daniels' testimony that Virgil had asked her to help kill Welch,

(2) testimony from McCollum as well as hair and fingerprint evidence suggesting that Virgil had been inside Welch's apartment, (3) Virgil's lying to Brandt about having visited Welch in February, (4) similarities between Virgil's shoe and the partial bloody footprint found in Welch's bathroom, (5) the blood found on Virgil's shoe and sweatshirt, (6) Becker's identification of Virgil at Welch's apartment on April 9th, (7) Sue Daniels' testimony that prior to April 9th, Virgil had asked for her assistance in murdering Welch, and (8) Joe Womack's testimony that Virgil had confessed to the murder. (Doc. # 212-3 at 1137-1160, 1383-1394). Notably, facts relating to Virgil's alleged theft of Welch's credit card and other conflicts between Welch and Virgil were not presented at trial.

Virgil's defense at trial centered on two main themes: (1) the absence of forensic evidence linking Virgil to the crime and (2) the reasonable possibility that someone else had committed the murder, including Isaac Grubbs or James Becker. (*Id.* at 1314-1370). Virgil's defense attorney, Robert Patton, called Karen Walling, Brian Cave, and Richard Beal, all of whom provided testimony suggesting Grubbs may have been the perpetrator. (*Id.* at 1189-1215, 2237-2260). However, Virgil's theory of Grubbs as the perpetrator was hampered by Walling's admission on cross-examination that "it would be safe to say" that the man she claimed was Grubbs left her lake house "around seven thirty, quarter to eight" on April 11th, which was after Grubbs was recorded killed by police at 7:23 p.m. that day. (*Id.* at 1181, 1184). The jury found Virgil guilty and chose a sentence of seventy years' imprisonment. (*Id.* at 1399, 1443).

In 2010, the Kentucky Court of Appeals granted Virgil's motion for release of evidence for DNA testing. *Virgil v. Commonwealth*, 403 S.W.3d 577 (Ky. Ct. App. 2013). DNA testing from the victim's vaginal swab excluded Virgil as a contributor, while DNA

analysis of the cigarette taken from the toilet was deemed inconclusive. (Doc. # 234-11 at 2, 7). Further, DNA testing showed with reasonable certainty that the blood found on Plaintiff's shoe and sweatshirt did not belong to Welch. (Docs. # 234-11 at 7 and 234-47 at 2). Finally, hairs recovered from the crime scene were found not to contain Virgil's DNA. (Doc. # 234-47 at 3). Based on this new evidence, the Campbell Circuit Court in December 2015 granted Virgil's unopposed motion for a new trial. (Doc. # 234-46).

In August 2016, prosecution witness Joe Womack recanted his testimony at Virgil's trial and grand jury that Virgil had confessed to him about murdering Welch. In an affidavit, Womack asserted that Virgil had not confessed to him in prison and that a detective—alleged to be Defendant Wagner—had supplied to him all the inculpatory information against Virgil. (Doc. # 234-8 ¶¶ 17-19, 22-23). Womack further alleged that Wagner had coerced him into testifying by threatening to charge him with accomplice liability. (*Id.* ¶ 20). According to Womack, Wagner paid him in cash in advance of his testimony and prosecutor Hoot Ebert promised to write a letter in his favor to the parole board. (*Id.* ¶¶ 25, 43).

Womack repeated these allegations to a grand jury in December 2016. (Doc. # 236-2 at 29-70). The grand jury declined to reindict Virgil. (Doc. 234-15 at 130). Shortly thereafter, on January 6, 2017, the Commonwealth dismissed all charges against Virgil. (Docs. # 234-15 at 135-136 and 234-17).

Following the dismissal of his criminal case, Virgil filed this civil action under 42 U.S.C. § 1983 and state law against the City of Newport as well as the Individual Newport Defendants Brandt, Wagner, Moore, Niemeier, Desentz, Bradford, Page, Fromme, and Sears. (Doc. # 49-1 at 1). Virgil also sued the cities of Norwood and Cincinnati, Norwood

Police Officer Steve Daniels, and Cincinnati Police Officers Mike Slayback, Robert Cardone, and Mike Phillips for their roles in what Virgil describes as a joint investigation with the City of Newport into a possible serial killer. (*Id.*). In the operative Second Amended Complaint, Virgil asserts numerous federal constitutional violations for withholding of evidence (Count I), malicious prosecution (Count II), fabrication of evidence (Count III), supervisory liability (Count IV), failure to intervene (Count V), civil conspiracy (Count VI), and municipal liability (Count VII), as well as state-law tort claims for negligent supervision (Count IX), intentional infliction of emotional distress (Count X), and vicarious liability (Count XI). (*id.* at 24-35).

In its January 9, 2018 Memorandum Opinion and Order, the Court dismissed all claims against the City of Norwood and Norwood Police Officer Steve Daniels except for Virgil's due process claim in Count I. (Doc. # 97 at 41). The Court also granted the City of Newport's Motion to Dismiss as to Count X (intentional infliction of emotional distress) and Count XI (respondeat superior). (*Id.*). Finally, the Court granted the Individual Newport Defendants' Motion to Dismiss Count IV (supervisory liability) and Count X but denied those Defendants' Motion to Dismiss the due process claims on the basis of qualified immunity. (*Id.* at 42). The Individual Newport Defendants filed an interlocutory appeal of the denial of qualified immunity. (Doc. # 102). The Sixth Circuit Court of Appeals affirmed this Court's denial of qualified immunity in an unpublished opinion. *Virgil v. City of Newport*, 745 F. App'x 618 (6th Cir. 2018).

During the intervening discovery period, the parties made numerous attempts to depose recanting witness Joe Womack, who is currently confined at the Marion Correctional Institute in Ohio. (Doc. # 141). During the first attempt on August 28, 2019,

Womack refused to answer any questions from counsel despite the issuance of a subpoena. (Doc. # 147-1 at 8-9). The next attempt came on December 30, 2020. During that deposition, Womack answered all the questions posed by Plaintiff's counsel, and some of the questions posed by counsel for the City of Newport. (Doc. # 239-1 at 22-76). Womack refused, however, to answer most of the questions posed by counsel for the Individual Newport Defendants, Jeffrey Mando. Womack appeared to be offended by Mando's questions regarding his educational background and criminal record and thereafter stopped answering any questions, frequently invoking his Fifth Amendment right to silence in response.[3] (*See, e.g.*, *id.* at 9-11, 16-21, 77).

Citing Womack's lack of cooperation, the Individual Newport Defendants filed a Motion for Writ of Habeas Corpus Ad Testificandum. (Doc. # 239). On March 9, 2021, United States Magistrate Judge Edward B. Atkins granted the Motion and ordered that Womack appear for a deposition before him at the federal courthouse in Covington. (Doc. # 256). Magistrate Judge Atkins also appointed counsel for Womack. (Doc. # 283 at 6). At the deposition before the Magistrate Judge, Womack made clear that he would be invoking his Fifth Amendment right to silence and would not answer any questions posed to him, including from attorneys other than Mando:

> I would like to save us all some time right now. I'm not answering any questions. I'm pleading the Fifth one time to all the questions asked, and then I'm going to totally shut down.

---

[3] Womack appeared particularly affronted when asked by Mando, "[h]ow would you describe your skills at reading and writing?" (Doc. # 239-1 at 10). Plaintiff's counsel objected to this line of questioning as irrelevant and harassing. (*Id.*). Magistrate Judge Atkins overruled that objection orally at Womack's third deposition in Covington. (Doc. # 283 at 8). This Court similarly ruled that the Individual Newport Defendants would be permitted to ask general background questions at the third deposition similar to the ones posed to Womack at his second deposition. (Doc. # 279).

(*Id.* at 19); (*see also id.* at 17-18, 26, 31). Womack indicated that he understood the potential consequences of failing to follow the Court's orders:

> THE COURT: Okay. I just, you know, in an abundance of caution too, I think for everyone's benefit, Mr. Womack, I just want to make sure that you do understand that if you fail to comply with my orders directing you to answer questions in this case today, sanctions could be imposed, including potentially recommending in this case that your testimony be stricken, which means your affidavit would not be considered, your testimony in your prior deposition would not be considered. You would not be in the role as a witness in any way in this case
>
> Now, do you understand that, sir?
>
> MR. WOMACK: Yes, sir.

(*Id.* at 30-31).

Following the third unsuccessful attempt at deposing Womack, the Individual Newport Defendants moved to strike Womack's affidavit from the record and preclude his testimony at trial. (Doc. # 284). That motion has been fully briefed, (*see* Docs. # 286-1 and 289), and the Court heard argument on that motion on June 9, 2021, (Doc. # 291). Thus, that motion is also ripe for the Court's review.

Finally, Plaintiff has narrowed some of the issues for the Court's consideration. In his summary judgment response brief, Virgil has moved to voluntarily dismiss Individual Newport Defendants Desentz, Bradford, Page, Fromme, and Moore, as well as Cincinnati Defendants Cardone, Slayback, and Phillips. (Doc. # 234 at 22 n.3). In addition, Plaintiff no longer appears to maintain a municipal liability claim against the City of Norwood. Plaintiff continues to assert claims against Individual Newport Defendants Brandt, Wagner, Sears, and Niemeier, as well as Norwood Police Officer Daniels and the Cities of Newport and Cincinnati.

## II.    ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate when the record reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  Once a party files a properly supported motion for summary judgment, by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotation marks omitted).  However, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Id*. at 252.

The Court must "accept [the non-moving party's] evidence as true and draw all reasonable inferences in his favor." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 255).  The Court may not "make credibility determinations" or "weigh the evidence when determining whether an issue of fact remains for trial." *Id*. (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001)).  "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251-52).  If there is a dispute over facts that might affect the

outcome of the case under governing law, the entry of summary judgment is precluded. *Anderson*, 477 U.S. at 248.

## B.     Due Process (Count I)

Plaintiff alleges that Newport Police Officers Brandt, Wagner, and Sears, Norwood Police Officer Daniels, and Cincinnati Police Officers Cardone, Phillips, and Slayback violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), when they withheld exculpatory evidence from the state prosecutor prior to trial.  (Doc. # 234 at 84). As the Court noted in its decision on Defendants' Motions to Dismiss, "the Sixth Circuit has held that 'the due process guarantees recognized in *Brady* also impose an analogous or derivative obligation on the police to disclose evidence whose exculpatory value is apparent to officers.'  'That duty is discharged once an officer delivers such evidence to the prosecutor's office.'"  (Doc. # 97 at 9) (quoting *Army v. Collins*, 488 F. App'x 957, 961-62 (6th Cir. 2012)).

"*Brady* violations involve a three-part test: 'The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"  *United States v. Castano*, 906 F.3d 458, 466 (6th Cir. 2018) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  The prejudice prong is sometimes referred to as the "materiality" requirement.  *Bies v. Sheldon*, 775 F.3d 386, 397 (6th Cir. 2014).  In addition, Defendants raise the defense of qualified immunity, meaning that to get to a jury, Plaintiff must show a genuine issue of material fact that Defendants violated *clearly established* federal law.  *Pearson v. Callahan*, 555 U.S. 223,

231 (2009). Virgil's *Brady* claims proceed under five (5) theories. (Doc. # 234 at 101 & n.36). Each is discussed in turn.

### 1. Investigative File of Alternate Suspect Isaac Grubbs

Virgil first claims that Newport Police Officer Rick Sears failed to turn over evidence from an internal investigation into the death of Isaac Grubbs, a suspect in Welch's murder who was shot and killed by police two days before the discovery of Welch's body. (Doc. # 234 at 103 & n.37). The assertedly withheld investigative file contains evidence that Grubbs was twice committed to a mental hospital, had exhibited homicidal ideations, was diagnosed with a personality disorder and alcoholism, and had broken his girlfriend's arm. (Doc. # 236-4 at 47-50). According to Virgil, this information about Grubbs' violent tendencies would have bolstered his defense at trial that Grubbs was Welch's killer. (Doc. # 234 at 104-105). Furthermore, Virgil asserts that this information would have prompted Virgil's criminal defense counsel, Robert Patton, to explore whether Grubbs was hospitalized at the facility where Welch worked, potentially explaining the origin of Welch's relationship with Grubbs. (*Id.* at 105).

Virgil's *Brady* claim on this basis fails under the suppression prong, as the record shows conclusively that Virgil's criminal defense counsel had access to the Grubbs investigative file. In support of his claim, Virgil points to Sears' admission in his deposition that the Grubbs file was not turned over to the prosecutor or defense counsel because it was kept separate from the Welch murder investigation as a matter of policy. (Doc. # 238-1 at 228). Virgil argues that this admission creates a triable issue of fact that Sears committed a *Brady* violation by withholding evidence relating to an alternate suspect. (Doc. # 234 at 104) (citing *Bies*, 775 F.3d at 400).

However, Patton testified that he knew of Grubbs' death at the hands of police officers prior to Virgil's trial and suspected that an internal investigation had taken place. (Doc. # 234-33 at 143-144).  In fact, about one week before the start of Virgil's trial, Patton moved the state court "to order the Newport Police Department to open its sealed internal investigation file on the shooting by the Newport City Police of Isaac Grubbs on the night of April 11, 1987, and allow the defense to copy those portions which would be relevant to defendant's defense as exculpatory evidence."  (Doc. # 196-24).  That motion was granted the following day in an order stating that "both parties shall meet with the City Solicitor or representative to examine the file to determine whether or not the file contains exculpatory evidence."  (Doc. # 212-70 at 2).  Accordingly, while Sears may have initially failed to disclose the Grubbs file to prosecutors, the file was apparently made available to Virgil's counsel at the City Solicitor's office.  That is enough to defeat Virgil's *Brady* claim.

"There can be no *Brady* violation where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information.'" *Castano*, 906 F.3d at 466 (quoting *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991)).  Moreover, information discoverable with such "minimal investigation" cannot give rise to a *Brady* claim.  *Jalowiec v. Bradshaw*, 657 F.3d 293, 311 (6th Cir. 2011) (quoting *Coleman v. Mitchell*, 268 F.3d 417, 438 (6th Cir. 2001)).

In response, Virgil asserts that while the state court may have ordered the Government to meet with defense counsel regarding the Grubbs file, Patton has testified that he does not recall ever attending such a meeting, and in any event, never saw the contents of the file.  (Doc. # 234 at 106-107).  Virgil therefore invites the Court to infer that

the Government suppressed the evidence in the Grubbs file notwithstanding the state court's order. Such an inference is not reasonable, however, given the absence of evidence that the Government failed to adhere to the state court's order. Furthermore, Patton's failure to recall meeting with the City Solicitor is by itself insufficient to create a genuine issue of material fact that the evidence was not made available. The Sixth Circuit has explained that testimony by a criminal defense attorney that he does not remember receiving exculpatory evidence is insufficient to meet a *Brady* claimant's burden to show that the evidence was suppressed. *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998); *see also Smith v. Massey*, 235 F.3d 1259, 1275 (10th Cir. 2000). If anything, Patton's testimony suggests that his lack of knowledge of the Grubbs file was due to his own negligence, not the state's malfeasance. In his deposition, Patton refused to suggest that the City Solicitor had violated the state court's order and instead admitted to the possibility that he simply missed the order from the state court and failed to obtain the file from the City Solicitor.[4] (Doc. # 234-33 at 145-146). Accordingly, Defendant Sears' Motion for Summary Judgment on this aspect of Plaintiff's *Brady* claim is **granted**.

### 2. *Evidence Implicating Suspect James Becker*

In a footnote, Plaintiff asserts that Newport Officer Brandt withheld evidence implicating suspect James Becker, who was Welch's boyfriend around the period when she was murdered. (Doc. # 234 at 101 n.36). The evidence that Brandt allegedly withheld included a statement from a witness suggesting that Becker may have stolen money from

---

[4]     This claim fails for an additional reason. Upon Patton's filing of the subpoena for the Grubbs file, the prosecutor was put on notice of the existence of the file, thereby discharging any disclosure duty on the part of Lieutenant Sears. *See Moldowan v. City of Warren*, 578 F.3d 351, 402 (6th Cir. 2009) (noting that "[t]he *Brady* rule . . . 'encompasses evidence known only to police investigators and not to the prosecutor'") (quoting *Strickler*, 527 U.S. at 280-81); *Army*, 488 F. App'x at 962.

Welch, perhaps providing a motive to kill Welch. (Doc. # 234-5 at 6). Another witness reported to Brandt that Becker had inquired about whether Welch's pink jacket had been found in the trunk of her car, when in fact the jacket had been recovered in the bathroom near Welch's body. (Doc. # 234-4 at 32). Plaintiff suggests that this latter statement is exculpatory because it shows Becker's concern about being forensically linked to the jacket. (Doc. # 234 at 101 n.36).

Assuming that this *Brady* theory has been properly presented,[5] it fails because no reasonable jury could conclude that the Becker evidence was suppressed. First, the record demonstrates that Brandt's notes detailing the Becker evidence were included in the Welch investigative file. (Docs. # 234-4 at 32 and 234-5 at 6). Plaintiff makes no assertion that Brandt's placing his notes in the file was insufficient to meet his obligation to turn over this evidence to the prosecutor.

Second, defense attorney Patton testified that he had unfettered access to the prosecutor's investigative notes through an "open file system." (Doc. # 234-33 at 40-44, 91). Absent a showing that evidence was omitted from an investigative file or obscured by the prosecutor in bad faith, the existence of an open file system precludes a finding of suppression for purposes of *Brady*. *United States v. Warshak*, 631 F.3d 266, 297 (6th Cir. 2010). Plaintiff makes no suggestion that the Becker evidence was either missing from the file or deliberately concealed by the prosecutor.

---

[5] The Sixth Circuit has held that "[r]aising an argument in a footnote is not sufficient to 'clearly present' an issue to the district court," the result of which is forfeiture of that issue on appeal. *Blue Cross & Blue Shield v. Klein*, 117 F.3d 1420, 1997 WL 400095, at *2 (6th Cir. 1997) (unpublished table decision) (quoting *Building Serv. Local 47 Cleaning Contractors v. Grandview*, 46 F.3d 1392, 1398-99 (6th Cir.1995)); *see also Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 487 (6th Cir. 2005).

The only evidence of suppression offered by Plaintiff is Patton's testimony that he did not know about the Becker evidence until after trial. (Doc. # 234 at 101 n.36). Citing this testimony, Plaintiff contends that "Defendants fail to show that they actually disclosed this information." (*Id.*). Yet, Plaintiff, as the party asserting the *Brady* claim, has the burden of proof to show suppression. *Cleary v. Cnty. of Macomb*, 409 F. App'x 890, 902 (6th Cir. 2011); *Coe*, 161 F.3d at 344. Patton's testimony that he lacked knowledge of certain evidence is insufficient to meet this burden. The government fulfills its *Brady* obligation when it makes exculpatory evidence available; it is not required to ensure that a defendant becomes knowledgeable of that evidence. *See Warshak*, 631 F.3d at 297; *Spirko v. Mitchell*, 368 F.3d 603, 610 (6th Cir. 2004). Thus, Brandt's Motion for Summary Judgment on Plaintiff's second *Brady* theory is **granted**.

### 3. Fabricated and Coerced Testimony from Witness Joe Womack

Virgil's next *Brady* claim is brought against Newport Police Officer Wagner, who Virgil alleges coerced witness Joe Womack into testifying falsely against Virgil and withheld this fact from the prosecutor. (Doc. # 234 at 107). In support of his claim against Wagner, Virgil relies heavily on Womack's affidavit, in which Womack asserts that he was coerced by a Newport detective into testifying falsely that Virgil had confessed to the Welch murder while sharing a cell with Womack at the Lebanon Correctional Institute. (Doc. # 234-8 at 5). Plaintiff contends that the detective Womack refers to in his affidavit is Defendant Wagner. (Doc. # 234 at 109-111). Womack states explicitly in his affidavit that "I lied when I stated that William Virgil confessed to killing Retha Welch." (Doc. # 234-8 ¶ 7). According to Womack, he had no personal knowledge of the Welch murder and knew only that Virgil had a detainer from Kentucky for a crime based on a

conversation with Virgil through the window of an adjacent cell. (*Id.* ¶¶ 3, 6). The affidavit recites the process in which the detective provided facts about the murder for Womack to memorize. (*Id.* ¶¶ 17-19, 22-23, 26, 32-33, 35). Womack goes on to state that "the detective made it clear to me if I didn't lie and repeat what he wanted me to say, that I would face charges relating to the murder/complicity." (*Id.* at ¶ 20). Womack made assertions of a similar nature in his testimony at a grand jury in 2016. (Doc. # 236-2 at 29-70).

Virgil's coercion and fabrication based *Brady* claims are fraught with evidentiary problems. As the Individual Newport Defendants correctly argue, the relevant portions of Womack's affidavit and 2016 grand jury testimony may not be considered at summary judgment because they constitute inadmissible hearsay evidence not subject to an exception or exemption under the Rules.[6] Although "parties may resist a summary judgment motion by presenting evidence not in an admissible *form*, such as an affidavit, the evidence itself still must be admissible." *N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d

---

[6] Plaintiff argues that the Individual Newport Defendants forfeited any challenge to the admissibility of Womack's 2016 grand jury testimony by failing to raise the issue in their summary judgment reply brief or in their Motion to Strike. (Doc. # 286-1 at 11-12). This argument misses the mark. It is true that "if a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived." *Ganesh v. United States*, 658 F. App'x 217, 220 (6th Cir. 2016) (alteration omitted) (quoting *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994)). But here, Plaintiff cannot fairly argue that he submitted Womack's 2016 grand jury testimony in support of his fabrication and coercion claims. Plaintiff in his summary judgment response brief cites Womack's grand jury testimony only a handful of times, while citing Womack's affidavit over forty times. More to the point, the relevant citations of the 2016 grand jury transcript are provided merely to establish that Wagner was the detective Plaintiff encountered at the Lebanon Correctional Institute, a fact Defendants do not dispute in their reply brief. (*See* Doc. # 234 at 72, 111, 153). Accordingly, the Individual Newport Defendants were under no obligation to argue for the exclusion of Womack's grand jury testimony and sensibly argued for the exclusion of Womack's affidavit instead. It should also be noted that the Individual Newport Defendants addressed the admissibility of the grand jury testimony in their first opportunity to do so after Plaintiff raised the issue in response to Defendants' Motion to Strike. (*See* Doc. # 289 at 10-19).

1273, 1283 (6th Cir. 1997); *accord Alexander v. CareSource*, 576 F.3d 551, 558-59 (6th Cir. 2009). Thus, for example, Womack's sworn statements in his affidavit and 2016 grand jury testimony would be admissible if Womack could later present the evidence through testimony at trial. *See, e.g.*, *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990) ("[H]earsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present the evidence through direct testimony, i.e., in a form that would be admissible at trial.") (internal quotation marks omitted); *Wyatt v. Nissan N. Am., Inc.*, --- F.3d ----, 2021 WL 2177668, at *13 (6th Cir. May 28, 2021).

Unfortunately for Plaintiff, Womack's conduct strongly suggests that he will not consent to cross-examination at trial, and consequently the jury would not be allowed to consider his testimony. During his depositions, Womack invoked the Fifth Amendment and flatly refused to answer any questions from counsel for the Individual Newport Defendants, including when directly ordered to do so by Magistrate Judge Atkins. (Doc. # 283 at 30-31). This was despite the Magistrate Judge's warning that any refusal to be cross-examined may result in the exclusion of Womack's testimony later. (*Id.* at 15, 30-31). Plaintiff has provided no assurance that Womack will change course, and it is reasonable to assume that he will not given his earlier contumacious conduct, including his most recent refusal to answer questions from any of the parties. (Doc. # 283 at 19). Should Womack refuse to be cross-examined at trial, the Court would likely strike his testimony in its entirety. *See United States v. $148,840.00*, 521 F.3d 1268, 1277 (10th Cir. 2008). This authority extends to recalcitrant witnesses who are not under the control of any party, as is the case here. *See United States v. Esparsen*, 930 F.2d 1461, 1470-

71 (10th Cir. 1991); *Lawson v. Murray*, 837 F.2d 653, 656 (4th Cir. 1988); *United States v. Doddington*, 822 F.2d 818, 822 (8th Cir. 1987).

Given the strong likelihood that Womack will continue to remain silent or at a minimum resist cross-examination, the Court will not consider his sworn statements at the summary judgment stage on the basis that Womack will testify to those statements at trial. The Sixth Circuit has on multiple occasions upheld a district court's decision to exclude sworn statements of a non-party witness under similar circumstances. For example, in *Tolliver v. Federal Republic of Nigeria*, the Sixth Circuit reasoned that "[a]n affidavit should be stricken on a motion for summary judgment if the witness invokes the Fifth Amendment to shield himself from questioning during pre-trial discovery." 128 F. App'x 469, 471 & n.1 (6th Cir. 2005). Similarly, in *Beckett v. Ford*, 384 F. App'x 435, 446-47 (6th Cir. 2010), the Sixth Circuit held that a witness who invoked the Fifth Amendment during a deposition and who indicated a continued unwillingness to testify would be "unavailable" for trial, the result of which was the exclusion of the deponent's affidavit on hearsay grounds.

District courts within the Sixth Circuit have reached similar results. *See McKellar v. State Farm Fire & Cas. Co.*, No. 14-cv-13730, 2016 WL 304759, at *8 (E.D. Mich. Jan. 26, 2016); *Bumpas v. Ryan*, No. 3:07-cv-766, 2013 WL 2418258, at *2 (M.D. Tenn. June 3, 2013). These district court cases hold that it is improper to rely on affidavit evidence from a non-party witness who, like Womack, "has made himself unavailable for discovery and for whom there is even no indication he will be available for trial."[7] *Bumpas*, 2013

---

[7]    Plaintiff asserts that *McKellar* is distinguishable on the ground that the uncooperative witness there was under the party's control. (Doc. # 286-1 at 30). But nothing in *McKellar* suggests that this was the case. Plaintiff does correctly point out that, unlike in this case, the witness in *McKellar* failed to physically appear for his deposition and was not disclosed on the

WL 2418258, at *2 (quoting *Dedvukaj v. Equilon Enters., LLC.*, 301 F. Supp.2d 664, 668 (E.D. Mich. 2004)).

Because Womack is unavailable to testify at trial, Plaintiff argues that Womack's affidavit and 2016 grand jury testimony are nevertheless admissible because they contain "statement[s] against interest," which are generally admissible when the declarant is unavailable to testify at trial. (Doc. # 286-1 at 36-37). *See* Fed. R. Evid. 804(a)(2), (b)(3). A statement against interest includes any statement which, at the time of its making, "had so great a tendency to . . . expose the declarant to civil or criminal liability" such that "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true." Fed. R. Evid. 804(b)(3)(A). As alluded to earlier, Womack arguably falls under Rule 804's definition of a declarant who is "unavailable," which includes one "who refuses to testify about the subject matter despite a court order to do so." Fed. R. Evid. 804(a)(2); *see Beckett,* 384 F. App'x at 447 (invocation of Fifth Amendment privilege rendered a witness "unavailable" within the meaning of Rule 804(a)(2)); *United States v. Slatten*, 865 F.3d 767, 805 (D.C. Cir. 2017) (same); *cf. United States v. Barlow*, 693 F.2d 954, 961 (6th Cir. 1982) (same as to the marital privilege). However, as explained below, the sworn statements in Womack's affidavit and 2016 grand jury testimony that tend to support Plaintiff's *Brady* claim are not "statement[s] against interest" as contemplated by Rule 804(b)(3).

As an initial matter, Plaintiff does not identify which of Womack's sworn statements would be admissible under Rule 804, stating only generally that "Mr. Womack's 2016

---

plaintiff's trial witness list. (Doc. # 286-1 at 30). *See McKellar*, 2016 WL 304759, at *7-8. There is little distinction, however, between a witness who appears physically at a deposition but who refuses to be cross-examined, and a witness who fails to appear at all.

grand jury testimony and his affidavit" exposed him to criminal and civil liability. (Doc. # 286-1 at 37). This is inadequate to meet Plaintiff's burden as the proponent of the evidence to show that it is admissible. *See Wyatt*, --- F.3d ----, 2021 WL 2177668, at *13 (citing Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment); *Auto Indus. Supplier ESOP v. Ford Motor Co.*, 435 F. App'x 430, 448 (6th Cir. 2011) (noting that on summary judgment, "[t]he proponent of the evidence has the burden of proof and must lay an appropriate foundation."). The Sixth Circuit has explained that "when ruling upon a narrative's admissibility under [Rule 804(b)], a court must break it down and determine the separate admissibility of each 'single declaration or remark.' This means that a court, 'when determining the admissibility of a narrative, must examine it sentence by sentence,' in order to determine what sentences are self-inculpatory and what sentences are collateral." *United States v. Cox*, 871 F.3d 479, 490 (6th Cir. 2017) (alteration omitted) (quoting *United States v. Canan*, 48 F.3d 954, 959-60 (6th Cir. 1995)). Plaintiff has not explained how any of Womack's particular declarations would be admissible.

Furthermore, while some of Womack's statements in his affidavit, such as "I lied when I stated that William Virgil confessed to killing Retha Welch," could conceivably expose him to liability for perjury, the same cannot be said of Womack's statements regarding coercion by Newport detectives which relate to Plaintiff's *Brady* claim. Womack's testimony at Virgil's trial never touched upon the issue of coercion, so his later statement that he was coerced does not contradict his trial testimony. And while these statements may put Officer Wagner at risk of civil liability—as demonstrated by this lawsuit—they have no effect on Womack in this regard.

Likewise, Virgil has not demonstrated how Womack's statements about being fed false information and getting coached as a witness by Officer Wagner are self-inculpatory. When given the opportunity at oral argument, Plaintiff's counsel pointed to several of these statements in Womack's 2016 grand jury testimony, but without citing any prior inconsistent statement in the 1987 grand jury or 1988 trial transcripts. (Doc. # 291 at 20-22). Thus, Plaintiff has once again failed to engage in the "fact-intensive inquiry" required to determine the admissibility of hearsay statements under Rule 804(b)(3). *Canan*, 48 F.3d at 959. Plaintiff's counsel at oral argument, more specifically, drew the Court's attention to the following passage in Womack's 2016 grand jury testimony, asserting that it contained statements against interest:

> A.      An officer came and got me, took me back to the deputy Warden's office, and that's when a detective was there and he asked me what did I know about the case and I told him I didn't really know anything and he started reading things off of this – this sheet of paper about certain details about the case that I had no idea of, you know.
>
> Q.      Can you – can you give an example of some of the things that you learned that he read off of that piece of paper that you didn't know before?
>
> A.      How he was supposed to have hit her in the head with this vase and they didn't know if that was the murder weapon. They think – He told me that was the murder weapon, how he drug [sic] her to the bathroom and left a trail of blood from the living room to the bathroom. Things like that, you know.
>
> Q.      So that was the first time you had heard it?
>
> A.      Ever.
>
> . . . .
>
> Q.      So they told you some of the details. What did they ask you to do at that point?
>
> A.      To repeat it, to parrot it, you know what I'm saying, back to them.

Q. Were you in agreement from the very beginning to do that?

A. Yes.

(Doc. # 236-2 at 38-40). Plaintiff's counsel also highlighted Womack's statement at the 2016 grand jury that he and Plaintiff never shared the same cell, a statement which Plaintiff says conflicted with Womack's trial and 1987 grand jury testimony. (Doc. # 236-2 at 52).

Some of the statements in the quoted passage would likely expose Womack to charges of perjury. For instance, Womack's sworn statement that he had no prior knowledge of Welch's murder is clearly inconsistent with his statements at trial that Virgil had confessed to him about the murder. In addition, Womack's statement that he never shared a cell with Virgil was contradicted by his 1987 grand jury and trial testimony.[8] Yet, even assuming these statements were perjurious and therefore constitute "statements against interest," they do not tend to prove that Wagner was the source of Womack's false testimony and thus do not further Plaintiff's fabrication-based *Brady* claim.

In contrast to the statements just described, Womack's statements tending to show fabrication by Defendant Wagner would not subject Womack to liability for perjury. Womack's statement that the facts he testified to at trial *were provided by a detective* is not strictly inconsistent with his trial testimony implicating Virgil in the murder. Stated differently, that a detective provided Womack information about the Welch murder does

---

[8] It is questionable whether Plaintiff's statements about being confined in the same cell as Virgil concerned a material matter, as required for a perjury conviction. *Holbrooks v. Commonwealth*, 85 S.W.3d 563, 569-70 (Ky. 2002); *United States v. Lawrence*, 308 F.3d 623, 631-32 (6th Cir. 2002). Womack represented in his 2016 grand jury testimony that he was able to speak with Virgil while the two were in adjacent cells, so his false testimony about being confined in the same cell was of little importance. (Doc. # 236-2 at 70).

not exclude the possibility that Womack received that same information from Virgil or that he simply made up the information himself. An essential element of perjury, both in Kentucky and under federal law, is that the sworn statement be necessarily false. *Commonwealth v. Thurman*, 691 S.W.2d 213, 215 (Ky. 1985) (citing Ky. Rev. Stat. § 523.050); 18 U.S.C. § 1623(c). Because Womack's statements that a detective provided him with information about the Welch murder do not contradict his trial testimony regarding Virgil's confession, these statements, while relevant to Plaintiff's fabrication theory, are not self-inculpatory.

Caselaw makes clear that non-inculpatory hearsay statements may not be considered under Rule 804(b)(3), even though they are made as part of a fuller confession. *See Williamson v. United States*, 512 U.S. 594, 600-01 (1994); *Beckett*, 384 F. App'x at 444. "The fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability." *Williamson*, 512 U.S. at 600. In an analogous area, the Sixth Circuit has ruled that the doctrine of completeness, which allows a party to admit additional portions of a statement in order to provide context, "does not make inadmissible evidence admissible." *United States v. Dotson*, 715 F.3d 576, 582 (6th Cir. 2013) (quoting *United States v. Crosgrove*, 637 F.3d 646, 661 (6th Cir. 2011)).

Accordingly, although Womack's non-inculpatory statements concerning fabrication by Defendant Wagner provide context to Womack's inculpatory statements, that fact does not render the non-inculpatory statements admissible under the Rules of Evidence.

This conclusion is amply supported by the Sixth Circuit's decision in *Beckett*, a case with strikingly similar facts to this one. In *Beckett*, a witness provided an affidavit recanting his trial testimony implicating the plaintiff in a murder. 384 F. App'x at 443. At the murder trial, the witness told the jury that the plaintiff had confessed to murdering the victim in a conversation while the two were in prison. *Id.* at 438. In his later affidavit, the witness denied ever having known about the plaintiff's role in the murder. *Id.* at 443. The witness in *Beckett* further alleged that investigators had coerced him into testifying and had provided him with investigative facts implicating the plaintiff.[9] *Id.* As the witness had refused to testify at a hearing and had since died, the plaintiff argued that these hearsay statements in the affidavit were admissible as statements against penal interest because they exposed the declarant to the possibility of criminal liability for perjury. *Id.* at 444. The Sixth Circuit rejected that argument for all but the declarant's statement that he "had no prior knowledge of the involvement of Dale Beckett in the murder he now stands convicted of." *Id.* The court reasoned that "[the declarant] did not incur any criminal or civil liability by stating that he was threatened by [the detective] [or] that [the detectives] coached his testimony." *Id.* The court in *Beckett* upheld the exclusion of these non-inculpatory statements related to the detective's coercion and fabrication despite the fact that they were "made within a broader narrative that [was] generally self-inculpatory." *Id.* (quoting *Williamson*, 512 U.S. at 600).

In addition to criminal liability for perjury, Plaintiff raises the possibility that Womack's admissions about fabricated testimony would expose him to civil liability for

---

[9]     Specifically, the recanting witness swore that he "was informed by the detective and prosecutor on what to testify to during the Grand Jury and Jury Trial concerning investigative facts in the murder case implicating Dale Beckett by being rehurst [sic] and going over investigative facts in the case." *Beckett*, 384 F. App'x at 443.

conspiracy under § 1983. (Doc. # 286-1 at 37). But conspiracy requires voluntary participation, *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000), something which would be impossible to prove in this case considering Womack's numerous claims that he was threatened and coerced into testifying. In any event, the Sixth Circuit has held that "witnesses in judicial proceedings are absolutely immune from civil liability under 42 U.S.C. § 1983 based on their testimony, even if they knowingly gave perjured testimony." *Macko v. Byron*, 760 F.2d 95, 97 (6th Cir. 1985) (per curiam).

Finally, Plaintiff argues unconvincingly that Womack's statements are admissible under the residual hearsay exception in Federal Rule of Evidence 807. (Doc. # 286-1 at 15). Under Rule 807(a), "a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804" if

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Here, Womack's statements are simply not supported by sufficient guarantees of trustworthiness to be admissible under Rule 807. Although made under oath, Womack's statements describe events that took place almost three decades earlier and are in significant tension with earlier sworn statements he provided at Virgil's 1987 grand jury and 1988 jury trial. Moreover, as Plaintiff concedes, Womack has improperly asserted his Fifth Amendment privilege to avoid cross-examination, (Doc. # 286-1 at 35), a fact which undeniably lessens Womack's credibility. As one court has put it in the context of a criminal case, "[w]here a defense witness's invocation of Fifth Amendment protection against self-incrimination amounts to a refusal to be cross-examined, the testimony

31

cannot be considered reliable." *Denham v. Deeds*, 954 F.2d 1501, 1504 (9th Cir. 1992). Consistent with this view, courts have declined to admit sworn statements under the residual hearsay exception from witnesses who purposefully avoided being cross-examined. *See, e.g.*, *Hussey v. Chase Manhattan Bank*, No. Civ.A. 02-7099, 2005 WL 1787571, at *9 (E.D. Pa. July 27, 2005); *ID Sec. Sys. Can., Inc. v. Checkpoint Sys.*, 198 F. Supp.2d 598, 625-26 (E.D. Pa. 2002).

The absence of a valid reason for avoiding cross-examination distinguishes this case from *United States v. Barlow*, cited by Plaintiff, in which the Sixth Circuit deemed evidence sufficiently trustworthy under the residual hearsay exception. (Doc. # 286-1 at 15-16). In *Barlow*, the Sixth Circuit upheld the admission of grand jury testimony of the defendant's wife, who had asserted a valid spousal privilege as a basis for not testifying at trial. *Barlow*, 693 F.2d at 962. In doing so, the court took note of the differing outcomes in *United States v. Gonzalez*, 559 F.2d 1271 (5th Cir. 1977), and *United States v. Carlson*, 547 F.2d 1346 (8th Cir. 1976). *See Barlow*, 693 F.2d at 960-61. In *Carlson*, the Eighth Circuit held that the district court had properly admitted the grand jury testimony of a witness under the residual hearsay exception whose refusal to testify at trial stemmed from his fear of reprisal by a co-defendant. 547 F.2d at 1352-54. The witness in *Gonzalez*, by contrast, had no apparent reason for refusing to testify at trial, a fact which the Fifth Circuit concluded made his grand jury testimony less reliable and thus inadmissible under the residual hearsay exception. 559 F.2d at 1274. Viewed in this context, a witness who justifiably invokes a privilege, such as in *Barlow*, or who articulates genuine reasons for not wanting to testify, such as in *Carlson*, clearly stands apart from

a witness such as Womack, who has provided no legitimate basis for avoiding the scrutiny of cross-examination.

The narrow scope of the residual hearsay exception further counsels against its application here. Courts in the Sixth Circuit "take a restrictive view of the residual exception under Rule 807," *Bailey v. United States*, 115 F. Supp.3d 882, 891 (N.D. Ohio 2015); *accord United States v. Thurman*, 915 F. Supp.2d 836, 868-69 (W.D. Ky. 2012), employing Rule 807 "very rarely, and only in exceptional circumstances," *Deere & Co. v. FIMCO Inc.*, 260 F. Supp.3d 830, 840 (W.D. Ky. 2017) (quoting Fed. R. Evid. 803(24) advisory committee notes). For the reasons discussed, this case does not present exceptional circumstances justifying the use of Rule 807.[10]

Plaintiff relies exclusively on Womack's sworn statements to support his coercion and fabrication allegations. Accordingly, he has produced no admissible evidence showing that Wagner coerced Womack into testifying or supplied Womack with false

---

[10]     Plaintiff's argument that he is "entitled to call Mr. Womack to testify for purposes of invoking the Fifth Amendment," is misplaced. (Doc. # 286-1 at 34). Plaintiff makes no attempt to explain how a hypothetical negative inference from his testimony *at trial* would assist Plaintiff in meeting his evidentiary burden *on summary judgment*. Moreover, Plaintiff has not cited a case in which a court considered the possibility of an adverse inference at trial when evaluating a motion for summary judgment. In the case Virgil cites, *Lawrence v. Madison County*, 176 F. Supp.3d 650, 673-74 (E.D. Ky. 2016), the court gave the plaintiff the benefit of an adverse inference on summary judgment when a witness had already invoked the Fifth Amendment in response to a particular question during a deposition. Here, in contrast, although Womack has invoked the Fifth Amendment on numerous occasions, he has not done so in response to a question that would provide support for any of Plaintiff's claims. "The inference drawn from a [party's] silence will always depend on the nature of the question asked." *Id.* at 663. (internal numbering omitted). Thus, Womack's blanket assertions of his Fifth Amendment right at the beginning of his depositions and in response to the Individual Newport Defendants' general background questions cannot form the basis for an adverse inference on any probative fact in the case. Finally, notwithstanding the above, Plaintiff's argument fails because an adverse inference "can only be drawn when independent evidence exists of the fact to which the party refuses to answer." *Id.* (quoting *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000)). The only probative evidence of Plaintiff's fabrication claim comes from Womack's affidavit and 2016 grand jury testimony, which the Court has already held to be inadmissible.

evidence implicating Virgil in the Welch murder. As inadmissible evidence "must be disregarded" at the summary judgment stage, *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007), Virgil's *Brady* claims premised on coercion and fabrication cannot stand.

In so ruling, the Court is cognizant of the unfortunate reality that Plaintiff is disadvantaged by Womack's recalcitrance, a matter over which Plaintiff has no control. However, it would be comparably disadvantageous to Defendant Wagner to admit Womack's sworn statements without the benefit of cross-examination, "the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). As the proponent of the evidence, Plaintiff bears the burden to demonstrate that the prejudicial effect of Womack's out-of-court statements is sufficiently mitigated by the likelihood that the statements are trustworthy and reliable. Plaintiff's conclusory argument on that matter, particularly with respect to the statement-against-interest exception in Rule 804(b)(3), is insufficient to overcome that burden. Accordingly, the Individual Newport Defendants' Motion to Strike (Doc. # 284) is **granted**, and their Motion for Summary Judgment on this aspect of Plaintiff's *Brady* claim is also **granted**.

### 4. *Pretrial Payments to Witness Joe Womack*

Even without the use of Womack's affidavit or sworn testimony, however, there is sufficient evidence in the record to overcome summary judgment on Virgil's *Brady* claim regarding undisclosed payments to Womack. Defendant Wagner stated in his deposition that, sometime before Virgil's trial, Womack asked Wagner to put some money into his prison account, and that Wagner obliged. (Doc. # 234-7 at 348-350, 352). Wagner did not recall whether he secured the money from the police department or from the

prosecutor's office, but testified that if the money had come from the police department, the prosecutor's office would not have known about the payment. (*Id.* at 350). Wagner further testified that he did not document the payment in any written report. (*Id.* at 350-351). This fact was confirmed by Commonwealth Attorney Michelle Snodgrass, who testified that her review of Virgil's prosecutorial file did not reveal any information about a payment to Womack. (Doc. # 234-15 at 149).

Construing this evidence in the light most favorable to Virgil, a reasonable jury could find that Wagner violated *Brady* by failing to report the Womack payment to prosecutors. The duty to disclose under *Brady* encompasses impeachment evidence, *Strickler*, 527 U.S. at 280-81, which the Sixth Circuit has found to include payments to a government witness, *Thomas v. Westbrooks*, 849 F.3d 659, 665 (6th Cir. 2017). Such payments create the possibility of "pecuniary bias" on the part of a government witness, thereby lessening the witness's credibility at trial. *See id.* at 665. Indeed, it is easy to see how evidence of a payment to Womack would have been useful impeachment material, particularly in light of Womack's statements at trial that he was a disinterested witness motivated by a desire to do the right thing. (Doc. # 212-3 at 730-732). The evidence of payment to Womack was therefore favorable to Virgil and satisfies the first element of Virgil's *Brady* claim.

Wagner resists this conclusion, asserting that evidence of monetary payment to a witness "is only *Brady* material if there is cause to believe that it was provided to a witness *in exchange for his testimony*." (Doc. # 212 at 63) (emphasis in original). However, the case cited by Wagner for this proposition, *Bell v. Bell*, 512 F.3d 223 (6th Cir. 2008) (en banc), arguably supports the opposite conclusion. In *Bell*, the prosecutor's notes showed

that a government witness had requested consideration in exchange for favorable testimony in the petitioner's case. *Id.* at 232. There were also records from the government witness's own criminal proceeding showing that he had received a lenient sentence. *Id.* The en banc Sixth Circuit concluded that the notes and sentencing records should have been disclosed as impeachment material, even though the petitioner had failed to establish the existence of an agreement between the witness and the prosecutor.[11] *Id.* at 232-33.[12]

Furthermore, this purported agreement requirement for *Brady* claims involving pecuniary bias appears nowhere in Sixth Circuit caselaw. In at least two cases, the Sixth Circuit has determined that the government breached its obligations under *Brady* when it failed to disclose cash payments to a witness before trial. *See Thomas*, 849 F.3d at 665; *Robinson v. Mills*, 592 F.3d 730, 737 (6th Cir. 2010). In neither of these cases is it apparent that the government witness received payment directly in exchange for inculpatory testimony against the defendant. In *Thomas*, where the government witness received $750 in advance of her trial testimony, "there [was] no allegation that [the witness] formally served as a confidential informant" and "the record [did] not disclose how the payment in question arose." 849 F.3d at 665. And while the government witness

---

[11] The petitioner's *Brady* claim in *Bell* ultimately failed with respect to the prosecutor's notes because there was no prejudice, and with respect to the sentencing records because they were available to petitioner as a public record. *Bell*, 512 F.3d at 235-37.

[12] Wagner also relies upon *Hanna v. Ishee*, 694 F.3d 596, 610 (6th Cir. 2012), where the Sixth Circuit stated in dictum that "evidence that a witness sought consideration for his testimony is only *Brady* material if there is cause to believe that the witness actually reached an express or tacit agreement with the prosecution in exchange for his testimony." (Doc. # 212 at 63). This statement does not address the factual situation here, where Womack's request for consideration was actually fulfilled. Furthermore, this statement in *Hanna* appears to be in tension with the dictum in *Bell*, discussed above.

in *Robinson* had previously served as a paid informant for the government, there was no indication that she had received payment directly in agreement for her testimony in the defendant's case.  592 F.3d at 738.

It is true that the government need not disclose a payment made to a witness *after* trial absent evidence of a pretrial agreement.  *See Thomas v. United States*, 849 F.3d 669, 680 (6th Cir. 2017).  In addition, courts do not presume the existence of a *quid pro quo* simply because the witness received a benefit subsequent to his testimony.  *See id.* That is not the situation here, however, as Womack received payment from Officer Wagner *before* his trial testimony.  This distinction between pre- and post-trial payments is illustrated by the Sixth Circuit's decisions in *Thomas v. Westbrooks* and *Thomas v. United States*, companion cases involving collateral attacks by a defendant on his state and federal convictions, respectively.  As discussed, the Sixth Circuit held in *Thomas v. Westbrooks* that the payment to the government witness in advance of Thomas's state trial was material impeachment evidence that was wrongfully withheld, warranting the issuance of a writ of habeas corpus.  849 F.3d at 665.  Not so with regard to Thomas's federal claim, however.  In the Sixth Circuit's words, "[t]he timing of the payment to [the witness], which took place after the federal trial but before the state trial, causes Thomas's federal *Brady* claim to fail."  *Thomas*, 849 F.3d at 680.  The court explained that Thomas was "unable to present evidence that [the witness] had knowledge before her federal testimony that she would receive the money, or that she made a deal to testify in lieu of being prosecuted."  *Id.*  Accordingly, as Womack was paid prior to his trial testimony, Virgil is not required to show that the payment was contingent on Womack's inculpatory testimony in order to state a claim under *Brady*.

A reasonable jury could also conclude that Virgil was prejudiced by the Government's failure to reveal the Womack payment, thereby satisfying the remaining contested element of Virgil's *Brady* claim. Wrongfully withheld evidence is prejudicial if, had it been presented to the jury, it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Womack was an important witness for the prosecution; little if any physical evidence connected Virgil to the crime, and while Sue Daniels testified that Virgil had expressed a desire to kill Welch, she was not a particularly reliable or credible witness. Daniels was a convicted felon, who admitted that her alcohol abuse "ha[d] caused a lot of memory loss." (Doc. # 212-3 at 625, 646). Daniels also testified to having a contentious relationship with Virgil, including having attempted to shoot Virgil with a revolver. (*Id.* at 649). Womack was the only witness who testified that Virgil had confessed to the murder. Furthermore, Womack's account of Virgil's confession was detailed and included information about the murder scene that was corroborated by the physical evidence presented. (*Id.* at 222, 231, 712-713, 966-968). Signifying Womack's prominent role in the case, the prosecutor devoted a significant portion of his closing argument to discussing Womack's testimony, and characterized Womack's recitation of corroborating details as "the clinching blow." (*Id.* at 1391-1394). A defendant's inability to expose a witness's pecuniary bias is prejudicial when, as here, "the case 'hinges on the jury's critique' of a key witness." *Thomas*, 849 F.3d at 665 (alteration omitted) (quoting *Robinson*, 592 F.3d at 736).

Just as significantly, Womack in his trial testimony dismissed defense counsel's suggestion that he had received any benefit from the government, as demonstrated by this exchange:

> Q. I asked you what you were getting out of this. That was the question. I now see that you're trying to tell the jury what to do.
>
> A. You know, what am I getting out of this. What am I getting out of this?
>
> Q. Yes. What are you getting out of this?
>
> A. I'm putting a little more values and scruples in my life. I'm getting a little bit more morals. It's no[ ] longer sense to walk on the edge of the border. Do you see what I'm saying?
>
> Q. You're being promised nothing? No early release? No early parole? No nothing; right?
>
> A. Not a McDonald's hamburger.

(Doc. # 212-3 at 731-732). Furthermore, the prosecutor stated during closing argument that the jury should abandon any thought that Womack received consideration for testifying:

> And nowhere in the evidence, that is what you are to base it on, there is no evidence that anything was promised to Joe Womack to come down here and testify before you. And I can represent to you that no promises were made. There is no evidence. He said he wasn't even promised a hamburger.

(Doc. # 212-3 at 1381). These facts again resemble those in *Thomas v. Westbrooks*, where the *Brady* violation was held to be prejudicial. The *Thomas* court observed that the government's failure to disclose the evidence of payment to its witness was "particularly egregious in light of the State's repeated emphasis of [the witness's] high-minded reasons for testifying—that is, that she was testifying because it was the 'right

thing to do.'"  849 F.3d at 662.  Even worse, the court said, was "the fact that the prosecutor failed to correct the record even after [the witness] squarely denied receiving any 'reward' money in exchange for her testimony against [the defendant]."  *Id.*

Wagner argues that the evidence is not material because the size of the payment to Womack was small.  (Doc. # 212 at 63).  Yet, Wagner testified that he could not recall how much money he gave Womack, (Doc. # 234-7 at 350), and in any event, the Sixth Circuit has recognized *Brady* claims involving payments to witnesses as small as $70, *see Robinson*, 592 F.3d at 734.  The Seventh Circuit has similarly required disclosure of relatively minor benefits conferred upon a government witness before trial, including the free use of phones and extra conjugal visits while the witness was incarcerated.  *See United States v. Williams*, 81 F.3d 1434, 1438 (7th Cir. 1996).

Finally, Wagner's duty to disclose the payment to Womack was clearly established, making qualified immunity inappropriate.  In its opinion denying Defendants' Motion to Dismiss, the Court ruled that in 1988, it was clearly established that a police officer must disclose exculpatory evidence to prosecutors.  (Doc. # 97 at 18).  Further, it has been clearly established as early as 1972 that exculpatory and impeachment evidence are treated the same for purposes of a prosecutor's disclosure requirements.  *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972).  Moreover, it is self-evident that paying a witness ahead of his testimony is favorable impeachment evidence.  As discussed, such information creates the perception—whether justified or not—that a witness is biased in the government's favor.  This has been the consensus view since before 1988.  *See United States v. Shaffer*, 789 F.2d 682, 689 (9th Cir. 1986) ("[T]he facts surrounding the government's payment of [the witness's] expenses . . . could have been construed as

evidence that [the witness] was paid for his cooperation" and thus "could have been used to discredit [the witness]."); *United States v. Marino*, 658 F.2d 1120, 1125 (6th Cir. 1981) (noting in dictum that "evidence of monetary assistance given by the government to the Peltins is relevant to assess their credibility as witnesses"); *United States v. Librach*, 520 F.2d 550, 553 (8th Cir. 1975) ("The Government's failure to disclose protective custody and its substantial payment of almost $10,000 to [the witness] obviously could have affected the jury's judgment of the witness's credibility."). Accordingly, Defendant Wagner's Motion for Summary Judgment on this *Brady* theory is **denied**.

### 5. *Investigation into a Potential Serial Killer*

For his fifth and final *Brady* theory, Plaintiff alleges that Newport Police Officers Wagner and Brandt withheld certain evidence gathered as part of a joint investigation with the Norwood and Cincinnati Police Departments into a potential serial killer, evidence Plaintiff contends is exculpatory. (Doc. # 234 at 118). Virgil also asserts that Norwood Police Officer Steve Daniels as well as Cincinnati Police Officers Mike Slayback, Robert Cardone, and Mike Phillips had an obligation to disclose this evidence but did not. Although Plaintiff has moved to voluntarily dismiss the individual Cincinnati Defendants, he maintains a municipal liability claim against the City of Cincinnati based on the alleged constitutional violations of the Cincinnati officers. (Doc. # 234 at 129 n.52).

### i. **Newport Officers Brandt and Wagner**

Defendants Brandt and Wagner are not entitled to summary judgment on Plaintiff's serial-killer *Brady* theory, as there are triable issues of fact concerning whether Brandt and Wagner had knowledge of the evidence gathered as part of the serial killer

investigation and whether they violated their duty to disclose that evidence to the Commonwealth's attorney.

In reaching this decision, a brief background on the serial killer investigation is necessary. Around the time of Welch's murder, two other women were murdered in the Cincinnati area—Valerie Wilton in Saint Bernard, Ohio and Verlene Leon in Norwood, Ohio. (Docs. # 236-3 and 234-22 at 4). Because of Saint Bernard's limited resources, the Cincinnati Police Department was brought on to assist in the Wilton murder investigation. (Doc. # 234-38 at 63). These murders shared similarities, which prompted officers from these various jurisdictions to investigate whether the crimes were linked. (Docs. # 234-21 at 118, 129-132 and 234-22 at 195-196).

Although the parties disagree on how to characterize the subsequent investigation into these murders, it is clear that, at least for about a two-week period starting in mid-April 1987, investigators from Newport, Cincinnati, and Norwood met, corresponded, and shared information about the unsolved homicides. (*See, e.g.*, Docs. # 234-21 at 129-130 and 234-22 at 275-276, 283-288, 334-335). For example, officers from Saint Bernard met with Newport Defendant Brandt and Norwood Defendant Daniels "to compare notes and similarities of recent homicides." (Doc. 234-22 at 195). The result of the meeting was a side-by-side chart showing the similarities and differences between the murders. (*Id.*). In another example, contemporaneous notes by Saint Bernard Police Officer Kevin Condon indicate that he used evidence gathered by Newport detectives to explore whether Virgil could have committed the Wilton murder. (*Id.* at 308). Officers from these jurisdictions also interviewed some of the same witnesses, canvassed Virgil's neighborhood together, and jointly executed a search warrant on the home of Virgil's

father.  (*Id.* at 287- 289, 333-336).  Cincinnati Police Officer Robert Cardone assisted Newport Officer Brandt in the investigation into Virgil and accompanied Brandt to his interview with Virgil on April 17, 1987.  (*Id.* at 142).

The Wilton and Leon investigative files reveal that Virgil was a suspect in each of those two cases but was not charged.  (Docs. # 234-21 at 59, 234-22 at 275, and 236-3 at 115).  These files also contain, as expected, lists of suspects and details about the homicides.  The Wilton homicide investigation was closed when, on April 27, 1987, Hiram Hyden admitted to the murder in a suicide note.  (Docs. # 234-21 at 11-12, 15 and 234-22 at 131-136).  The agencies ultimately concluded that the murders were unrelated and appear to have ceased communicating about the serial killer investigation around the end of April 1987.  (Doc. # 234-3 at 148 and 234-22 at 281).

All appear to agree that the Wilton and Leon investigative files were not turned over to the Commonwealth's attorney and thus not included in the material disclosed to Virgil's defense counsel.  In addition, the Welch investigative file obtained by Virgil's defense counsel before trial is mostly devoid of information about the serial killer investigation.  However, the Welch file did contain a single-page report drafted by Brandt, which reads as follows:

> The officer from Norwood PD called me at app. 3:30 p.m. and stated that the information uncovered by P.O. Wagner had merit to it and they had spent the entire day following up on it. They also have been in contact with CIN P.D. Homicide and are working a case with similar characteristic[s] as ours and Norwood's murder. Norwood and Cincinnati Officers are meeting at 9:30 a.m. at A&D building and requested that our officers attend the meeting.

(Doc. # 234-4 at 20).  In addition to the above report, the file contained four notes regarding meetings between the three police agencies.  The most descriptive of these notes is reproduced here:

> On June 7, 1988, Detective Daniels of the Norwood Ohio Police Department was contacted concerned a meeting with Sgt. Brandt and he stated that in early 1987 there were three murders in the Greater Cincinnati area that had certain similarities those murders occurring in Newport, Norwood, and St. Bernard, Ohio. During that meeting, all of the investigating officers exchanged information and concluded that the three murders were not committed by the same individual. Shortly thereafter, an arrest was made in Newport, St. Bernard cleared their case and Norwood's remains open but they have a suspect.  (Doc. # 234-6 at 164).

Virgil's defense counsel also obtained a copy of the 1987 grand jury transcript, in which Defendant Brandt testified briefly about Virgil's status as a suspect in the other murder investigations:

> [O]ther police agencies made contact with us in reference to 2 other unsolved homicides in their jurisdictions, where they felt that possibly Mr. Virgil was involved in them. As it turns out that wasn't the case. One was in St. Bernard where they have solved that one, and another one was in Norwood and I don't know what the disposition is on that one. But there aren't any indications that he would have been involved in anything other than this . . . this incident.

(Doc. # 212-1 at 35).

Plaintiff argues that the above notes and brief testimony do not contain the names of the suspects in the Norwood and Saint Bernard murders or reveal the extent of the investigation into Virgil's involvement, information which was exculpatory because it showed that "Plaintiff was thoroughly investigated . . . and ultimately eliminated as the perpetrator" of the Wilton and Leon murders.  (Doc. # 234 at 121).  Further, Plaintiff argues that the information about the suspects identified in the serial killer investigation would have bolstered Virgil's defense by creating reasonable doubt about who killed Welch.

(Doc. # 234 at 122-123). One of the suspects in particular, Hiram Hyden (eventually determined to be Wilton's killer), was discovered to have received psychiatric treatment on April 6, 1987 at the hospital where Welch worked. (Doc. # 234-22 at 159). Plaintiff contends that this disclosure may have prompted independent investigation into the possibility of Hyden's connection to the Welch case. (Doc. # 234 at 120). Also during the course of the serial killer investigation, a Saint Bernard police officer interviewed Virgil's friend, Karen Oglesby, who provided the officer with certain items of women's clothing that Virgil had purportedly given her. The police officer showed the clothes to Welch's boyfriend and daughter, though the file does not indicate whether they positively identified the clothing as Welch's. Officer Wagner testified that had there been a positive identification, he would have documented it in a police report that would have been maintained in the file. (Doc. # 234-7 at 102-104). The absence of a positive identification, Plaintiff says, is favorable to the extent it shows Virgil was not in possession of Welch's clothes, as officers had at one point suspected. (Doc. # 234 at 64).

Defendants do not contest the exculpatory nature of this evidence, (*see* Docs. # 212 at 54-56, 263 at 43-49, and 223-2 at 16-18), nor could they. It is undisputed that officers from Newport, Cincinnati, and Norwood at one point in time investigated the possibility that the three murders were linked. It follows that any suspects developed during that period would be considered suspects in Welch's murder as well. Information about other "legitimate suspects" is generally favorable to a defendant and must be disclosed. *Gumm v. Mitchell*, 775 F.3d 345, 364 (6th Cir. 2014) (quoting *D'Ambrosio v. Bagley*, 527 F.3d 489, 499 (6th Cir. 2008)); *Bies*, 775 F.3d at 400. Further, to the extent that the murders were linked, the fact that Virgil was cleared as a suspect in the Wilton

and Leon murders would tend to exculpate him from the Welch murder.  That investigators ultimately abandoned the serial killer investigation, moreover, does not diminish the exculpatory nature of the evidence concerning alternative suspects.  As the Sixth Circuit has explained, "[w]ithholding knowledge of a second suspect conflicts with the Supreme Court's directive that 'the criminal trial, as distinct from the prosecutor's private deliberations, be preserved as the chosen forum for ascertaining the truth about criminal accusations.'"  *Bies*, 775 F.3d at 400 (alteration omitted) (quoting *United States v. Jernigan*, 492 F.3d 1050, 1056-57 (9th Cir. 2007)).

Although acknowledging the exculpatory character of the evidence, Defendants assert that the evidence was not suppressed because the notes in the Welch file and the grand jury testimony provided essential facts that should have prompted Virgil's counsel to discover the missing details.  (Docs. # 212 at 54-55 and 223-2 at 16-18).  Defendants point to defense attorney Patton's cross-examination of Brandt at trial as proof that Patton was aware of the serial killer investigation, the coordination between the Newport, Cincinnati, and Norwood police agencies, the similarities between the crimes, and Virgil's status as a suspect in all three murder cases.  (Docs. # 212 at 54-55, 216 at 11-12, and 223-2 at 18) (citing Doc. # 212-3 at 516-517, 524-526) (trial transcript).

But as Plaintiff correctly observes, neither the notes about the investigation in the Welch file nor Brandt's testimony at the grand jury contains the names of the victims or suspects in the Norwood and Saint Bernard murders, and neither provides any indication regarding the extent Virgil had been investigated as a suspect in those murders.  Nor did Patton have ready access to sources that would have uncovered this information.  Without the names of the victims, for example, it would have been difficult to track down

publicly available information about the murders.  These facts create a genuine issue of material fact as to whether the serial killer evidence was suppressed.

"*Brady* 'does not allow the State simply to turn over *some* evidence, on the assumption that defense counsel will find the cookie from a trail of crumbs.'" *United States v. Paulus*, 952 F.3d 717, 725 (6th Cir. 2020) (alteration omitted) (quoting *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 468 (6th Cir. 2015)).  Accordingly, in deciding whether evidence was suppressed, the relevant question is whether the defendant "would have had to follow a long trail of crumbs to get the missing details or whether he could have gotten the same information with minimal investigation." *Id.*  The Sixth Circuit in *Paulus* explained that "minimal investigation" is limited to "a simple search or request" and does not include subpoenaing information. *Id.*  As examples of "minimal investigation," the *Paulus* court identified an easy search of public records or the search of defendant's own records to find the information needed. *Id.* (citing *Castano*, 906 F.3d at 466; *Stojetz v. Ishee*, 892 F.3d 175, 205-06 (6th Cir. 2018)).  As discussed, information about the suspects in the Norwood and Saint Bernard murders was not contained in the notes disclosed to Virgil's counsel and could not have easily been found in the public record.  Indeed, it is hard to imagine how Patton would have tracked down this evidence without subpoenaing it from the government.  Accordingly, a reasonable jury could conclude that these missing details were not discoverable with minimal investigation and were therefore suppressed

The City of Newport challenges this conclusion, asserting that "details of the Wilton and Leon murders were widely published in area newspapers."  (Doc. # 223-2 at 18). Newport makes this assertion without citing any evidence in the record.  (*Id.*).  Even

assuming such newspaper articles existed, Patton would nonetheless have had difficulty locating them without the identity of the victims. Further, assuming that Patton had been able to obtain these newspaper reports, it is doubtful that they would have provided anything more than surface-level facts. For instance, any newspaper account would almost certainly not have included the extent to which Cincinnati and Norwood police investigated Virgil before clearing him. The Sixth Circuit made this very point in *Hughbanks v. Hudson*, noting that a newspaper article discussing a person's status as a suspect did not suffice to put defense counsel on notice that the police believed the person to be a *serious* suspect. *Hughbanks v. Hudson*, --- F.3d ----, 2021 WL 2521591, at *6 (6th Cir. June 21, 2021) (dictum) (citing *Strickler*, 527 U.S. at 284-85).

Contrary to the City of Newport's contention, (Doc. # 223-2 at 16, 18), this case is not controlled by the line of authority beginning with *United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990), which holds generally that a defendant "only need have 'the essential facts that would enable him to take advantage of the exculpatory evidence,' rather than all of the state's evidence on the point in question." *Jeffries v. Morgan*, 446 F. App'x 777, 782 (6th Cir. 2011) (quoting *Spirko*, 368 F.3d at 611). In contrast to the present case, *Todd* and its progeny involved exculpatory information obtainable with minimal investigation. In *Spirko*, for instance, the evidence suggesting that an accomplice may have been out of state when the crime occurred was already contained in memoranda of interviews of the accomplice that were turned over to the defendant. 368 F.3d at 610-11. Similarly, in *Todd*, the government's failure to disclose FBI reports containing exculpatory information was not a *Brady* violation because the defendant was aware of the identities of two witnesses who could provide the same information. As *Todd* demonstrates, a

defendant has no *Brady* claim when he could have easily obtained the exculpatory information from a source other than the government. *See Todd*, 920 F.2d at 405; *see also Coleman v. Mitchell*, 268 F.3d 417, 438 (6th Cir. 2001) (rejecting a *Brady* claim where the allegedly withheld exculpatory information "was available from varied sources beyond the control of the F.B.I."). Here, however, Virgil has presented evidence showing that the list of suspects from the Norwood and Saint Bernard murders was not readily available from other sources. Accordingly, a genuine issue of fact remains as to whether the state's disclosure was sufficient to put Virgil's counsel on notice of the need to investigate the Wilton and Leon murders.

In their reply brief, Brandt and Wagner submit that they had no duty to disclose the exculpatory evidence gathered in the serial killer investigation because they had no access to the Wilton and Leon files, which were under the exclusive control of the Cincinnati and Norwood Police Departments, respectively. (Doc. # 263 at 43). Brandt and Wagner cite caselaw to argue that absent a formal, joint investigation with Norwood and Cincinnati, information in the exclusive control of these other departments could not be imputed to Newport officers for *Brady* purposes. (*Id.* at 44) (citing cases).

This argument is largely beside the point because a reasonable jury could find that Brandt and Wagner had first-hand knowledge of much of the exculpatory evidence contained in the Wilton and Leon files. Indeed, the record is replete with documents describing meetings, phone calls, and other communications Brandt and Wagner had with members of these jurisdictions' police departments regarding the serial killer investigation and Virgil in particular. (*See, e.g.*, Doc. # 234-22 at 281, 283-288, 334-335). From this evidence, a reasonable jury could conclude that Brandt and Wagner knew, for

example, the identities of the suspects in the Wilton and Leon murders and that Virgil was a serious suspect in those investigations. The jury could furthermore conclude that this knowledge was not shared with the Commonwealth's attorney. Consequently, whether or not a formal, joint investigation occurred, Brandt's and Wagner's personal knowledge of exculpatory evidence collected by Norwood and Cincinnati officers is sufficient to create a disclosure duty on their part because that duty extends to information "known" to police officers investigating the offense. *Moldowan*, 578 F.3d at 402 (quoting *Kyles*, 514 U.S. at 438.

In addition to meeting his summary-judgment burden on the suppression prong, Virgil has established a genuine issue of fact that the withheld evidence gathered in the serial killer investigation was material. As discussed, the physical evidence presented at Virgil's trial was circumstantial and some of the Commonwealth's main witnesses, such as Sue Daniels, were seriously flawed. *See* Part II.B.4, *supra*. The jury was also presented with a plausible theory that Isaac Grubbs had been the perpetrator. Against this evidentiary background, the jury's knowledge that Virgil was eliminated as a suspect in two murder cases that investigators thought to be related may have been enough to create reasonable doubt. Moreover, the failure to turn over details about suspects in the Norwood and Saint Bernard murders hampered both Patton's pretrial investigation and his ability to develop any line of inquiry about these alternative suspects at trial.

Brandt and Wagner assert that any prejudice from the nondisclosure of the suspects in the Norwood and Saint Bernard murders was minimal because defense attorney Patton used the notes disclosed in the file to cross-examine Brandt about these

murders and how they were related.  A portion of that cross-examination is reproduced here:

Q. As part of your investigation, did you not also determine whether there was one or perhaps two other murders with similar circumstances surrounding them?

A. There were two other murders that occurred about the time.

Q. Pretty similar as far as the case; isn't that true? At least the one in Cincinnati was.

A. There were two murders that were - that had some similarities.

Q. Did you attend a meeting with Cincinnati Officers at the Alms & Doepke Building? Again, I'm referring to some of your notes. I'll show you. I think that's your handwriting on that; correct?

A. That's correct. Yes, sir.

Q. Does that refresh your memory any? Do you remember attending a discussion with the officers or having someone under your control?

A. Yes. The meeting occurred at the Norwood Police Department rather than - it was changed from what is on here.

Q. I see.

A. There was a meeting. And the final event on the one homicide Is that they located a suspect that he had written out a confession and then committed suicide. And then on other homicide, I'm not sure whether or not that was solved or not.

Q. Okay. They're [sic] a lot of striking similarities, were there not? The age of the people and the sexual attack and a lot of other areas?

A. There were some similarities; yes, sir.

Q. Apparently that never panned out in your investigation then; did it?

A. I didn't believe that Mr. Virgil was involved in those; no, sir.

Q. And you didn't believe that anybody else was involved in this one.

A. I believe that Mr. Virgil killed Retha Welch; yes, sir.

Q. I realize that. I wasn't asking whether you had an opinion of whether he killed her but I meant to say that none of those people ever became suspects in this case?

A. Oh, no, sir.

Q. The one that committed suicide or the other one –

A. No, sir.

(Doc. # 212-3 at 516-517).  It is true that from this testimony, Brandt revealed his opinion that he did not "believe" Virgil was involved in the Norwood or Saint Bernard murders. But this hardly tells the full story.  Brandt's testimony does not reveal that Virgil was fully investigated by these other agencies and apparently cleared.  Nor does this testimony reveal much in the way of detail about the similarities between the murders and the extent to which the agencies investigated whether they were connected.  The evidence of the serial killer investigation that came out at trial also would not have cured any prejudice that may have resulted from Patton's inability to investigate the suspects in these other murders.

In addition, the prejudice that resulted from the withholding of the evidence from the serial killer investigation must be considered on top of the prejudicial effect of Wagner's alleged failure to disclose a pretrial payment to Joe Womack.  As the Sixth Circuit explained in *Bies*, "[w]hen the State fails to turn over numerous pieces of favorable evidence, as it did in this case, the proper focus of *Brady*'s materiality inquiry is on the cumulative effect of the suppressed evidence on the outcome of the trial."  775 F.3d at 399.  Considering the collective effect of this evidence, a genuine issue of material fact

exists regarding whether the withheld evidence from the serial killer investigation undermines confidence in the verdict.

In sum, there is sufficient evidence from which a reasonable jury could find that Brandt and Wagner violated *Brady* by withholding favorable evidence gathered in the serial killer investigation and that this violation prejudiced Virgil.

Finally, Brandt and Wagner are not entitled to qualified immunity because Virgil has demonstrated that the constitutional right at issue was clearly established at the time of its alleged violation. As previously noted, this Court has already determined that, in 1988, police officers had a clearly established duty to disclose exculpatory evidence to the prosecuting attorney. (Doc. # 97 at 18). Brandt and Wagner contend that the requirement to turn over exculpatory evidence is "far too general" to put them on notice of liability for their conduct with respect to the serial killer investigation, and fault Plaintiff for failing to identify a case with more similar facts. (Doc. # 263 at 49). However, "in an obvious case, general standards can clearly establish the answer, even without a body of relevant case law." *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005) (internal brackets omitted) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). This is such a case. Evidence of other suspects is clearly favorable to the accused. Likewise, evidence that a defendant was investigated and cleared in cases that were thought to be linked is plainly exculpatory. A reasonable officer in Brandt's and Wagner's position would therefore have been on notice to disclose this evidence to the prosecutor. Accordingly, Brandt and Wagner's Motion for Summary Judgment on this *Brady* theory is **denied**.

### ii.     Norwood and Cincinnati Police Officers

Although Brandt and Wagner must stand trial for their role in the serial killer investigation, Virgil has failed to demonstrate that the Norwood and Cincinnati Police Officers suppressed any exculpatory information in their possession in violation of *Brady*. Because the Norwood and Cincinnati Police Officers concededly had no involvement in Virgil's prosecution,[13] they had no duty—much less a clearly established duty—to disclose evidence favorable to Virgil.  Accordingly, the *Brady* claim against these officers must fail.

"*Brady* and its progeny have recognized a duty on the part of the prosecutor to disclose material evidence that is favorable to the defendant over which the prosecution team has control."  *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007).  Courts have recognized that the "prosecution team" may include outside agencies that take part in a "joint investigation" with the prosecuting agency.  *See, e.g.*, *United States v. Risha*, 445 F.3d 298, 304 (3d Cir. 2006).  In these cases, the Sixth Circuit has suggested that the prosecutor would have "a duty to discover 'favorable evidence known to . . . others acting on the government's behalf in the case."  *Sutton v. Carpenter*, 617 F. App'x 434, 441-42 (6th Cir. 2015) (quoting *Kyles*, 514 U.S. at 437).  However, as the Norwood Defendants aptly point out, (*see* Doc. # 216 at 8-9), cases addressing a criminal defendant's due process right to information in the hands of outside parties or agencies focus solely on the *prosecutor's* obligation to discover and turn over this information, *see*

---

[13]     The Court in its earlier Order held that Plaintiff had failed to even plead that Norwood Officer Daniels had participated in Virgil's prosecution.  (Doc. # 97 at 21).  Plaintiff in his summary judgment brief makes no argument that any of the Cincinnati or Norwood Police Officers took part in the prosecution, arguing instead that those officers participated in a joint *investigation* with Newport Police Officers.  (Doc. # 234 at 124-125, 129-130).

*Sutton*, 614 F. App'x at 441 (and cases cited therein). The Sixth Circuit has made clear that members of other agencies acting on behalf of the prosecutor are under no similar obligation to disclose exculpatory evidence. *See Rimmer v. Holder*, 700 F.3d 246, 259 (6th Cir. 2012). The analysis in *Rimmer*, a case involving a joint investigation between federal and state law enforcement agencies, is on point and dispositive:

> It is true that, if the *federal government* had prosecuted Rimmer, it would have had an obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to provide him with any exculpatory information in its possession. Here, however, the FBI declined to prosecute Rimmer, who was prosecuted by Tennessee only. Thus, while the *state* may have breached its *Brady* obligations by failing to provide Rimmer with evidence of Darnell's FBI interview and photo-lineup identification, Rimmer presents no evidence that the FBI had any similar obligation.

*Id.* Thus, in the present case, any duty on the part of Brandt and Wagner to disclose information gathered in a joint investigation with the Cincinnati and Norwood Police Departments would not have extended to the Norwood and Cincinnati officers, whose agencies investigated but chose not to prosecute Virgil.

In arguing otherwise, Plaintiff cites no contrary authority and instead relies on this Court's earlier opinion denying Norwood Police Officer Daniels' Motion to Dismiss, in which it was stated that "police officers have a duty to disclose exculpatory evidence only if they are involved in the investigation or the prosecution at issue." (Doc. # 97 at 11). This ruling was made at the pleading stage without the benefit of a factual record and without briefing from all the parties. To the extent this statement conflicts with the holding in *Rimmer*, it is not binding at the summary judgment stage. The "law of the case doctrine is directed to a court's common sense and is not an inexorable command." *Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997) (internal quotation marks

omitted).  Accordingly, a court may reconsider an earlier ruling "where a decision is clearly erroneous and would work a manifest injustice."  *Id.*

Even assuming the Norwood and Cincinnati Officers had an obligation to disclose information they collected in a joint investigation with Newport Officers, that obligation was not clearly established at the time of the alleged violation, making qualified immunity appropriate.  Despite having the burden of demonstrating that the defendant is not entitled to qualified immunity, *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 478 (6th Cir. 2014), Plaintiff makes no attempt to show that, in 1988, a police officer from a non-prosecuting agency should have known to disclose exculpatory evidence gathered in a joint investigation with a prosecuting agency.

Plaintiff argues that the Court previously decided the qualified immunity issue with respect to the Norwood and Cincinnati Officers in its Order denying Norwood Officer Daniels' Motion to Dismiss.  (Doc. # 234 at 129, 152).  But unlike the Individual Newport Defendants, Norwood Officer Daniels did not raise the defense of qualified immunity in his Motion to Dismiss, and the Cincinnati Defendants did not even file a motion to dismiss. (*See* D oc. # 67).  Accordingly, the Court's earlier Order denying Defendant Daniels' Motion to Dismiss as to the *Brady* claim against him said nothing about whether Daniels violated clearly established law.  Plaintiff further errs in arguing that the Court of Appeals affirmed this Court's decision denying Daniels' Motion to Dismiss.  (*Id.* at 129, 152). Because the availability of an appeal for the denial of qualified immunity is an exception to the final judgment rule, *Bouggess v. Mattingly*, 482 F.3d 886, 887 (6th Cir. 2007), the Sixth Circuit's affirmance of this Court's decision necessarily covered only the denial of

qualified immunity for the Newport Officer Defendants.[14]  For these reasons, Norwood Defendant Daniels' Motion for Summary Judgment on Plaintiff's *Brady* claim is **granted**.

### C.  Malicious Prosecution (Count II)

Plaintiff brings a claim for malicious prosecution against Newport Officers Sears, Niemeier, Wagner, and Brandt, alleging that he was arrested, detained, and prosecuted without probable cause.  (Doc. # 234 at 134).  "The Sixth Circuit 'recognizes a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment,' which 'encompasses wrongful investigation, prosecution, conviction, and incarceration.'" *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quoting *Barnes v. Wright*, 449 F.3d 709, 715-16 (6th Cir. 2006)).  "To succeed on a malicious-prosecution claim under § 1983 when the claim is premised on a violation of the Fourth Amendment, a plaintiff must prove" four elements.  *Id.*  "First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant 'made, influenced, or participated in the decision to prosecute."  *Id.* (internal citations omitted).  "Second, because a § 1983 claim is premised on the violation of a constitutional right, the plaintiff must show that there was a lack of probable cause for the criminal prosecution."  *Id.*  "Third, the plaintiff must show that as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence, apart from the initial seizure."  *Id.* at 308-09 (internal citations omitted).  And "[f]ourth, the criminal proceeding must have been resolved in the plaintiff's favor."  *Id.* at 309.

---

[14]    To eliminate all doubt as to the scope of its decision on appeal, the Sixth Circuit stated that it was affirming the district court "on the reasoning of Part II(B)(1)(ii) of its January 9, 2018 order denying the Newport Police Officers' motion to dismiss Count One on qualified-immunity grounds."  *Virgil*, 745 F. App'x at 619.

The second element—whether there was a lack of probable cause for the criminal prosecution—is dispositive here. Virgil has not demonstrated a dispute of fact that his arrest on April 23, 1987 was supported by probable cause. Thus, the Individual Newport Defendants are entitled to summary judgment with respect to Virgil's malicious prosecution claim insofar as it is premised on a lack of probable cause at the time of Virgil's arrest. *See Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007). The following undisputed facts were known to Newport officers prior to the date Virgil was arrested:

(1) Welch knew Virgil through her ministry work at area penitentiaries. (Doc. # 234-5 at 153-154).

(2) Welch continued to visit and communicate with Virgil after his release from prison in January 1987, including serving as Virgil's counselor, securing him a room at Tender Mercies (a halfway house in Cincinnati), and assisting with him with tasks such as laundering clothes. (*Id.* at 39, 157). There was also evidence that Virgil had visited Welch at her home at least once since his release, including for the night. (Docs. # 212-1 at 38-39 and 234-5 at 39, 157-158).

(3) There was evidence that Welch had rejected Virgil's romantic overtures and that this had created tension between the two. According to Melveena McCollum, Welch's coworker, Welch had said that Virgil had tried to kiss her and that she had rebuffed him. (Doc. # 234-5 at 155). In McCollum's words, Welch "didn't like it," but that as far as she knew, it was an "isolated incident" and not a "continuing problem." (*Id.*). There was also a statement from Kathleen Lenz, the director of Tender Mercies, that Virgil wanted a romantic relationship with Welch and that "it was a struggle." (*Id.* at 39). Virgil's probation officer, Tracy Pomerleau, also noted to police that it was a "big concern" that "Welch kept being hit on." (*Id.* at 40). Finally, Virgil told Brandt in an interview on April 17, 1987 that he had discussed a relationship with Welch and was even considering marriage. (Doc. # 212-1 at 36-37).

(4) Virgil's acquaintance, Mary Bush, told Brandt that Virgil had appeared at her house on April 9, 1987 (the night Welch was last seen), between 11:30 p.m. and midnight and left without staying the night. (Doc. # 234-4 at 49). According to Bush, Virgil had arrived with another man and had a gold chain with him but no money. (*Id.*). In Brandt's interview notes, it states that "[Virgil] kept telling [Bush] that he stayed there Thursday." (*Id.*). At the 1987 grand jury, Brandt explained that Bush "said that [Virgil] kept trying to tell her that he stayed there Thursday night, and that he hadn't." (Doc. # 212-1 at 63).

Investigators who searched Welch's apartment after the murder noted that three gold chains were missing.  (Doc. # 234-4 at 300).

(5) There was evidence that Virgil had stolen Welch's credit card, and that Welch suspected Virgil.  This was reported by Melveena McCollum (Welch's colleague), (*see* Doc. # 234-5 at 155), Kathleen Lenz (the director of Tender Mercies), (*see id.* at 39), and Sue Daniels (Virgil's former girlfriend), (*see id.* at 161-162).  Daniels' probation officer, William Wilson, corroborated Daniels' statement to this effect.  (*Id.* at 176).  Brandt confirmed with Cinfed Credit Union that someone had made an unauthorized purchase on Welch's credit card on February 13, 1987 and had signed the receipt "J. Anderson." (*Id.* at 46-47).

(6) In a recorded statement to Brandt and Wagner, Daniels stated that "back in February" Virgil had asked her to assist him in killing Welch, specifically by "slitting her throat."  (*Id.* at 160-161).  Daniels recalled that Virgil had planned to steal property from Welch, including her credit cards and car, and then flee to New York.  (*Id.* at 162).  According to Daniels, the conversation took place where Virgil was staying at Tender Mercies and occurred on the night she was supposed to attend a Freddie Jackson concert at Music Hall.  (*Id.* at 164).  Daniels told detectives that she had alerted Wilson (her probation officer) of Virgil's plot shortly thereafter.  (*Id.* at 5).

(7) In a recorded statement to Brandt and Wagner, Wilson confirmed that during the first week of February 1987, Daniels had told him that a boyfriend she referred to as "Champaign" had asked for her help to murder a woman in Kentucky.  (*Id.* at 175).  (Several of Virgil's friends and acquaintances had referred to Virgil as "Champaign." (*See, e.g.*, Doc. # 234-4 at 49)).  Wilson recalled that the plot included taking the woman's car and credit cards.  (*Id.*).  Daniels purportedly told Wilson that the woman was a "social worker" who had visited Champaign in prison, had become close to him, and was being taken advantage of.[15]  (Doc. # 234-5 at 176).

These facts are sufficient to establish probable cause, which is "not a demanding standard," *Davis v. Gallagher*, 951 F.3d 743, 749 (6th Cir. 2020), and which depends upon a "practical, common-sense" determination made by examining the totality of the circumstances, *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Police had evidence from Sue

---

[15]    The Individual Newport Defendants argue that Becker's tentative identification of Virgil at Welch's apartment around 9:00 p.m. on the evening of April 9th bolsters a finding of probable cause.  (Doc. # 263 at 85-86).  Plaintiff, however, provides at the very least a colorable argument that Becker's identification resulted from an unduly suggestive photo array and was not sufficiently corroborated.  (Doc. # 234 at 141-142).  Hence, out of an abundance of caution, the Court declines to consider Becker's positive identification of Virgil in its probable cause analysis.

Daniels that Virgil had planned to murder Welch, and that he would do so with a knife. Daniels' story was corroborated by her probation officer, William Wilson, who told police that Daniels had alerted him to the murder plot in early February, prior to Welch's murder. Other aspects of Daniels' statement were also corroborated. For example, she reported that Virgil had stolen Welch's credit card, which matched the statement provided by Welch's colleague, Melveena McCollum. Daniels also accurately stated that Virgil had recently been hospitalized with meningitis. (Doc. # 234-5 at 163).

Further, the evidence that Virgil had stolen Welch's credit card substantiated Daniels' statement that Virgil had wanted to kill Welch in order to steal from her. In fact, the police documented that there were items missing from Welch's apartment, including gold chains and a car. Virgil was spotted carrying a gold chain on the night of April 9th, shortly after Welch had been seen for the last time.

In addition to a possible pecuniary motive on the part of Virgil, detectives could have reasonably suspected that Virgil was motivated by a personal conflict with Welch. Multiple individuals reported to police that Welch had received unwelcome sexual advances from Virgil, and that Welch had rejected those advances. Virgil's statement to Brandt that he wanted to marry Welch stood in stark contrast to the evidence suggesting Welch's desire for a platonic relationship. Newport Detectives also learned from at least three individuals that Welch had suspected Virgil of stealing her credit card, and evidence from Welch's credit union established that someone had made an unauthorized charge on Welch's card.

Plaintiff argues that probable cause was lacking given Daniels' questionable reliability, in particular her rocky relationship with Virgil and her status as a psychiatric

patient.  (Doc. # 234 at 140).  However, as a general matter, police reliance upon imperfect sources is common and does not destroy probable cause.  As the Sixth Circuit succinctly stated in *United States v. Czuprynski*, "persons with personal motives are often the source of very reliable information.  To require a police officer to discount such information would result in the rejection of a good deal of evidence relied upon daily by courts and juries."  46 F.3d 560, 564-65 (6th Cir. 1995) (en banc).  In addition, a statement from a witness with a motive to lie may nevertheless form the basis for probable cause if, as here, the statement is sufficiently corroborated.  *Lester v. Roberts*, 986 F.3d 599, 612 (6th Cir. 2021).  As discussed, Wilson substantiated Daniels' statement when he told investigators that Daniels had come to him in early February regarding Virgil's request for assistance in murdering Welch.  The details provided by Daniels regarding the murder weapon, Welch's stolen credit card, and Virgil's hospital stay were also supported by other sources.

Plaintiff correctly notes that certain aspects of Daniels' account do not hold up.  For example, local newspapers from 1987 do not support Daniels' statement that there was a Freddie Jackson concert in the early months of 1987.  (Doc. # 234 at 140).  But an informant's statements need not be completely corroborated in order to support probable cause*.  United States v. Strickland*, 144 F.3d 412, 417 (6th Cir. 1998).  "If 'an informant is right about some things, [she] is more probably right about other facts' regarding the suspect's illegal activity."  *United States v. Hines*, 885 F.3d 919, 925 (6th Cir. 2018) (quoting *Gates*, 462 U.S. at 244).

Plaintiff also claims that William Wilson, Daniel's probation officer, was later found to have either bought or sold drugs from Daniels, thus eroding his credibility "because

Daniels had leverage over him." (Doc. # 234 at 46). But even so, this fact diminishes, rather than negates, the corroborating effect of Wilson's statement, and as mentioned, aspects of Daniels' statement were corroborated by sources other than Wilson. Thus, as a matter of law, Daniels' statements were sufficiently corroborated "to justify a reasonable officer's belief" in the credibility of her account implicating Virgil. *See Lester*, 986 F.3d at 610 (quoting *Peet v. City of Detroit*, 502 F.3d 557, 564 (6th Cir. 2007)).

Also without merit is Plaintiff's argument that the Newport Officer Defendants "ignored exculpatory evidence when assessing probable cause against Plaintiff in 1987." (Doc. # 234 at 144). Among the pieces of evidence Plaintiff asserts were ignored are the tips from Karen Walling and Richard Beal purportedly implicating Isaac Grubbs in the murder. Yet, "just because the police have more than one potential suspect does not mean that they lack probable cause for all of the suspects." *Lester*, 986 F.3d at 611. Moreover, "there is a meaningful distinction between *disregarding* potentially exculpatory information and *disbelieving* it." *Id.* (internal quotation marks omitted). There is no evidence that Brandt disregarded Walling's tip. He spoke with her on the phone and heard her story but chose not to pursue it. (Doc. # 234-3 at 73). Plaintiff relies on *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000), to protest that Defendant Brandt should have investigated Walling's tip further rather than dismissing it as far-fetched. (Doc. # 234 at 11). But *Gardenhire* "merely stands for the proposition that when an officer makes a probable cause determination, that officer should consider all relevant evidence (including exculpatory evidence) and must investigate further if the evidence does not show probable cause." *Saltmarshall v. Prime Healthcare Servs.-Garden City LLC*, 831 F. App'x 764, 770 (6th Cir. 2020). Where, as here, "probable cause is

established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999). Accordingly, this argument lacks merit.

Finally, Plaintiff asserts that even if there was probable cause to charge him on April 23, 1987, Newport Officers lacked probable cause to continue Plaintiff's detention after subsequent exculpatory evidence came to light. (Doc. # 234 at 146). Specifically, in May 1987, Brian Cave informed Newport Police that, on April 11, 1987, he had seen a person fitting Grubbs' description wiping down a pink Cadillac near where Welch's car was recovered. (Doc. # 234-30 at 13-15). Cave claimed that it was clear the man was trying to eliminate fingerprint evidence and even closed the door with his backside in order to avoid touching any surfaces with his hands. (*Id.* at 14-15). Also after Virgil was charged, Newport investigators learned that much of the forensic evidence collected turned out to be inconclusive or favorable to Virgil. For instance, blood found on Virgil's shoe and sweatshirt was too small in quantity to test, and serology testing of semen found at the crime scene came back as either inconclusive or excluded Plaintiff as a contributor. (Doc. # 234-4 at 198-199).

Although this evidence was generally favorable to Virgil, it did not dissolve probable cause. The probable cause case against Virgil did not hinge on physical evidence recovered at the crime scene, and the forensic results did not eliminate Virgil as the perpetrator. The present case is therefore distinguishable from *Jones v. Clark County*, 959 F.3d 748, 759 (6th Cir. 2020), relied upon by Virgil, where "it could be reasonably inferred that the Commonwealth lacked the evidence it needed to continue its prosecution of [the plaintiff]" once additional forensic evidence became available. Further,

while the statement from Cave certainly increased the viability of Grubbs as a suspect, the case against Virgil also became stronger in the period shortly after Virgil was charged. On April 29, 1987, another of Virgil's girlfriends, Betty Kelow, told Brandt and Wagner that Virgil had also asked her to assist him in murdering Welch. (Doc. # 234-5 at 204). According to Kelow, Virgil wanted to murder Welch because she had threatened to report to his parole officer that he had stolen her credit card. (*Id.*). Kelow further stated that Virgil had made purchases with Welch's credit card at several stores, including Greco's clothing store. (*Id.* at 206-207). Newport officers had previously learned from Welch's credit union that someone had put an unauthorized charge on Welch's card at Greco's. (*Id.* at 46-47).

Plaintiff argues that Kelow's statement has minimal significance because there is evidence that it was fabricated, and Kelow had pending criminal charges that made her vulnerable to manipulation. (Doc. # 234 at 146). As to the second point, it has already been explained that a law enforcement officer may rely on statements from a pretrial witness whose credibility is in question when the statement is sufficiently corroborated. *See Lester*, 986 F.3d at 612. Several aspects of Kelow's statement were corroborated, including the allegation that Virgil had stolen Welch's credit card and that he had used it at Greco's clothing store.

Plaintiff's allegation that Kelow's statement was fabricated is also insufficient to discount its value. The evidence of fabrication Plaintiff points to is a gap in the recording during Kelow's interview. In the first segment, Kelow does not implicate Plaintiff in any crime. (Doc. # 234-5 at 188-203). Then, at Kelow's request, the tape recorder is turned off. (*Id.* at 204). Once it is turned back on seventeen minutes later, Kelow is heard

implicating Plaintiff in the murder and providing the facts about the credit cards. (*Id.* at 204-209).

This evidence does not demonstrate a dispute of fact that Kelow's statement was fabricated. The Sixth Circuit has expressed "a natural reluctance to infer official misconduct from ambiguous circumstances alone." *Southland Mall, Inc. v. Garner*, 455 F.2d 887, 890 (6th Cir. 1972); *see also Russell v. Gregoire*, 124 F.3d 1079, 1092 (9th Cir. 1997). Such an inference is especially unwarranted here, as Kelow was the one heard requesting that the recorder be turned off. Furthermore, Brandt was forthright about the break in the recording during his testimony at the grand jury, expressing regret that it raised the specter of fabrication.[16]  (Doc. # 212-1 at 68).

By comparison, in *Webb v. United States*, 789 F.3d 647 (6th Cir. 2015), the Sixth Circuit permitted a fabrication claim to go to a jury where the plaintiff provided affirmative evidence of wrongdoing by a law enforcement officer. The plaintiff in *Webb* alleged that DEA investigators had intentionally misdated the recording of a controlled call with the plaintiff. 789 F3d at 667. In support of this claim, the plaintiff provided a sworn statement that the call did not occur when investigators said it did, an allegation which was corroborated by the fact that there were no DEA phone records of a call between the agent and the plaintiff on that day. *Id.* at 668. In the same case, the court also found a dispute of fact regarding whether investigators had tampered with a phone call, noting that "[t]hree forensic experts used spectrographic analysis and other advanced

---

[16]     At oral argument, Plaintiff's counsel indicated that Kelow is still alive and was included in the parties' Rule 26(a) disclosures. (Doc. # 291 at 107-108). Thus, Plaintiff could have elicited additional evidence of wrongdoing by Brandt and Wagner by interviewing or deposing Kelow. Yet, there is no record of a recent statement from Kelow, and Plaintiff has not provided a reason why she would be unavailable to provide one.

techniques to identify evidence that someone had tampered with the recording to delete material." *Id.* at 668-69.

All told, the undisputed facts known to the Individual Newport Defendants leave no doubt that probable cause justified both Plaintiff's arrest and continued detention. As the presence of probable cause "dooms" a malicious prosecution claim, *Lester*, 986 F.3d at 609, Plaintiff has not demonstrated a constitutional violation on this ground against the Individual Newport Defendants.

Qualified immunity provides another basis to dismiss Plaintiff's malicious prosecution claim. In the malicious prosecution context, qualified immunity protects "defendants who mistakenly but reasonably conclude that probable cause exists." *Id.* at 607. To overcome this defense, Plaintiff must "identify cases with similar fact patterns in which courts found an absence of probable cause." *Id.* (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)). The lone case cited by Plaintiff, *Rieves v. Town of Smyrna*, 959 F.3d 678 ((6th Cir. 2020), (Doc. # 234 at 148), is not sufficiently analogous. *Rieves* involved the prosecution of individuals selling legal cannabidiol ("CBD") products. 959 F.3d at 685. The court held that state officers violated clearly established law by arresting store owners based on inconclusive laboratory evidence of the CBD products' illegality. *Id.* at 696. Unlike in *Rieves*, probable cause in Virgil's case did not hinge on the results of laboratory testing and consisted of numerous witness statements either implicating Virgil in the crime or establishing a motive on his part. Accordingly, at the very least, Brandt, Wagner, Sears, and Niemeier did not violate clearly established law. Their Motion for Summary Judgment on Plaintiff's malicious prosecution claim is therefore **granted**.

**D.      Fabrication (Count III)**

Virgil has brought a standalone fabrication claim relating to Joe Womack's allegedly false testimony at the 1987 grand jury and 1988 trial.  (Doc. # 234 at 149).  As with his *Brady* claim based on the same factual predicate, this claim necessarily fails because Womack's recanting statements in his affidavit and 2016 grand jury testimony are inadmissible.  *See* Part II.B.3, *supra*.  Although Plaintiff also relies on the evidence of Wagner's payments and promises of consideration to Womack, (Docs. # 234 at 151-152 and 291 at 96), these facts, standing alone, do not establish a jury question on whether Wagner fabricated Womack's testimony.

At oral argument, Plaintiff's counsel maintained that additional pretrial misconduct alleged against the Individual Newport Defendants also supports a fabrication claim.  This alleged misconduct includes: (1) an unduly suggestive photo array shown to Becker by Sears and Niemeier, (2) Brandt's statement in a warrant affidavit that Becker had made a positive identification of Virgil when in fact it was only a tentative identification, (3) Brandt's false statement in a warrant affidavit that lab reports showed Virgil's shoe may have been the source of the bloody print found at the crime scene, and (4) Betty Kelow's fabricated statement.  (Doc. # 291 at 101-102, 104-105, 107-108).

The Sixth Circuit recognizes a claim for fabrication of evidence when law enforcement officials falsify evidence during a criminal prosecution.  *See Webb*, 789 F.3d at 670; *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997).  Furthermore, unlike for a malicious prosecution claim discussed above, "[a] plaintiff does not need to show that the government lacked probable cause to prevail on a fabrication of evidence claim." *France v. Lucas*, 836 F.3d 612, 629 (6th Cir. 2016).

However, apart from his claim relating to Womack's false testimony, (Doc. # 234 at 139-142), nowhere in his brief does Plaintiff assert a standalone fabrication claim as it relates to falsification of evidence. Plaintiff has therefore forfeited this claim presented for the first time at oral argument. *See United States v. Jackson*, 918 F.3d 467, 493 (6th Cir. 2019). To be sure, Plaintiff mentions Kelow's allegedly fabricated statement and the unduly suggestive photo array in the section of his brief discussing malicious prosecution. But this evidence was offered to establish the absence of probable cause as well as Sears' and Niemeier's participation in Virgil's prosecution; it was not offered to assert an independent claim for relief. (*See id.* at 135, 138, 141-142). Thus, the Individual Newport Defendants' Motion for Summary Judgment as to Plaintiff's fabrication claims is **granted**.

### E.   Failure to Intervene (Count V)

Plaintiff has not demonstrated a triable issue of fact with respect to his failure-to-intervene claim. Plaintiff brings this claim against Officers Sears, Wagner, and Niemeier, asserting that those officers should have intervened to prevent Defendant Brandt from initiating charges against Plaintiff without probable cause. (Doc. # 234 at 154). In addition, Plaintiff alleges that Sears and Niemeier were aware that the evidence Brandt used to support probable cause included the results from an unduly suggestive photo lineup presented to James Becker. (*Id.*). Also, in Plaintiff's view, Sears, Wagner, and Niemeier should have intervened to stop Plaintiff's prosecution once it became clear that probable cause had dissolved after Plaintiff was charged. (*Id.*).

The Sixth Circuit has stated that in the excessive force context, a police officer is liable for failure to intervene when the officer "both (1) 'observed or had reason to know that excessive force would be or was being used, and (2) had both the opportunity and

the means to prevent the harm from occurring.'" *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). Such a claim is also viable in situations where, as Plaintiff alleges here, officers failed to prevent an arrest without probable cause despite having the means and the opportunity to do so. *See Bunkley v. City of Detroit*, 902 F.3d 552, 566 (6th Cir. 2018).

In this case, however, Plaintiff's failure-to-intervene claim clearly fails because he has not shown that probable cause was lacking, either at the time charges were filed or after he was indicted. By extension, Defendants had no duty to intervene in Plaintiff's prosecution. Even assuming probable cause did not exist, Plaintiff has not pointed to any evidence in the record showing that Defendants Wagner, Sears, or Niemeier knew Brandt was going to file a criminal complaint against Virgil on April 23, 1987, or that Brandt would rely upon the evidence from the assertedly improper photo lineup. Niemeier in particular was merely a patrol officer who had limited involvement in the investigation, so it is unlikely that he knew either the evidence against Virgil or the timing of Brandt's decision to charge Virgil. The closest Plaintiff gets to establishing a dispute of fact in this regard is Defendant Wagner's admission in his deposition that he had knowledge that his assistance in the investigation *could* lead to charges against Virgil. (Doc. # 234-7 at 146). That is plainly insufficient.

There is likewise no evidence that Newport officers had authority to stop Plaintiff's prosecution once he was charged. It is reasonable to think that Sears may have had this authority as supervisor of both Brandt and Wagner. However, Plaintiff simply fails to cite any record evidence showing as much. Nor does Plaintiff cite any cases where a court

denied summary judgment in similar circumstances. Plaintiff's claim therefore fails as unsupported and undeveloped.

Finally, Plaintiff argues that Newport Defendants Brandt and Wagner as well as Norwood Defendant Daniels should have intervened to make sure that the exculpatory evidence collected in the serial killer investigation was turned over to the prosecutor. At the outset, it is questionable whether an officer has a duty to intervene when the constitutional harm stems from inaction, rather than action. Assuming such a duty exists in this context, it was not clearly established in 1988, and therefore qualified immunity is warranted in favor of Defendants. A court in the Northern District of Ohio reached a similar conclusion, noting that there was no clearly established law "regarding a duty to intervene to prevent the withholding of exculpatory evidence in violation of *Brady*." *Elkins v. Summit Cnty.*, No. 5:06-cv-3004, 2009 WL 1150114, at *9 (N.D. Ohio Apr. 28, 2009). For these reasons, Defendants' Motion for Summary Judgment on Plaintiff's failure-to-intervene claim is **granted**.

### F. Conspiracy (Count VI)

Plaintiff alleges that Newport Officers Brandt, Wagner, Sears, and Niemeier participated in a conspiracy to "railroad" Plaintiff by withholding and fabricating evidence and taking part in other improper investigative techniques. (Doc. # 234 at 154). To prevail on a claim of conspiracy under § 1983, "[a] plaintiff must show that (1) a 'single plan' existed; (2) defendants 'shared in the general conspiratorial objective' to deprive the plaintiff of his constitutional rights, and (3) 'an overt act was committed in furtherance of the conspiracy that caused the plaintiff's injury.'" *Webb*, 789 F.3d at 670 (alteration omitted) (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)). Plaintiff contends

that Defendants Brandt and Wagner conspired with Norwood and Cincinnati police officers to withhold evidence collected in the joint investigation into a possible serial killer. (Doc. # 234 at 155). Sears and Niemeier allegedly joined in when they presented Becker with an improper photo lineup. (*Id.*). Finally, Plaintiff asserts that Wagner further participated in the conspiracy by fabricating statements from Betty Kelow and Joe Womack. (*Id.* at 155-156).

Some of these predicate acts Virgil identifies have already been determined not to be constitutional violations. For example, Virgil has not presented sufficient evidence to get to a jury on the issue of whether Kelow's statement was fabricated. Similarly, because Womack's affidavit has been stricken, Virgil cannot demonstrate a dispute of fact regarding whether Wagner fabricated Womack's testimony. Finally, although a reasonable jury could conclude that Wagner and Brandt violated *Brady* by failing to disclose evidence collected in the serial killer investigation, it is unclear whether this type of violation could serve as a basis for conspiracy liability. A *Brady* claim does not require a showing of bad faith, *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016), and Plaintiff points to no evidence of bad faith here with respect to the serial killer evidence. Thus, it stands to reason that this *Brady* violation, on its own, does not constitute evidence of a "common plan" to deprive Plaintiff of his rights, as required for a successful conspiracy claim. *Webb*, 789 F.3d at 671.

Moreover, absent an agreement between the Newport Officer Defendants and members of the Norwood or Cincinnati police departments, Plaintiff's conspiracy claim necessarily fails because of the intra-corporate conspiracy doctrine. That doctrine, applicable to § 1983 suits, "bar[s] conspiracy claims where two or more employees of the

same entity are alleged to have been acting within the scope of their employment when they allegedly conspired together to deprive the plaintiff of his rights." *Jackson v. City of Cleveland*, 925 F.3d 793, 818 (6th Cir. 2019). As no reasonable jury could find an agreement between Newport officers and an outside entity, Defendants' Motion for Summary Judgment on Plaintiff's conspiracy claim is **granted**.

### G. Municipal Liability (Count VII)

Plaintiff seeks to hold liable the City of Newport and the City of Cincinnati for the constitutional violations allegedly committed by those cities' individual officers.[17] To establish municipal liability, Plaintiff "must show that 'through its deliberate conduct, the municipality was the moving force behind the injury alleged." *Jackson*, 925 F.3d at 828 (internal quotation marks omitted). "A plaintiff does this by showing that the municipality had a 'policy or custom' that caused the violation of his rights. *Id.* (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

"There are four methods of showing the municipality had such a policy or custom: the plaintiff may prove '(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.'" *Id.* (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). Here, Plaintiff proceeds under the third theory with respect to the City of Newport, and under both the third and fourth theories with respect to the City of Cincinnati.

---

[17]     Plaintiff in his brief does not appear to discuss a *Monell* claim against the City of Norwood. Accordingly, that claim against Norwood has been abandoned.

A municipality may only be liable to the extent its individual officers violated the constitution. *D'Ambrosio v. Marino*, 747 F.3d 378, 391 (6th Cir. 2014). As set forth above, Plaintiff's surviving constitutional claims relate to (1) Defendant Wagner's alleged failure to disclose payments to Womack in violation of *Brady* and (2) Defendants Wagner's and Brandt's alleged failure to disclose material, exculpatory evidence gathered in the serial killer investigation. *See* Parts II.B.4 and II.B.5.i, *supra*. Because Plaintiff has not established a genuine issue of material fact that any of the Cincinnati Officers committed a constitutional violation, *see* Part II.B.5.ii, there can be no claim against the City of Cincinnati. *See D'Ambrosio*, 747 F.3d at 391. The City of Cincinnati's Motion for Summary Judgment is therefore **granted**.

That leaves the City of Newport. Plaintiff has presented sufficient evidence to survive summary judgment on its claim that the City of Newport failed to adequately train its officers in the handling of exculpatory materials.[18] "In order to show that a municipality is liable for a failure to train its employees, a plaintiff 'must establish that: 1) the City's training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the City's deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury.'" *Jackson*, 925 F.3d at 834 (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006)). Newport does not appear to challenge these last two elements, but maintains that its training was constitutionally adequate.

---

[18]     In contrast, Plaintiff does not even mention his failure-to-supervise claim in his brief. Counsel at oral argument insisted that this claim remains in play. (Doc. # 291 at 114-115). But claims for failure to supervise and failure to train are distinct, *see Amerson v. Waterford Twp.*, 552 F. App'x 484, 491 (6th Cir. 2014), so Plaintiff's failure to address the former claim results in its abandonment.

There is a genuine issue of fact as to whether Newport's training program was inadequate for the tasks that its officers had to perform, including recording and disclosing material, exculpatory evidence.  First, a reasonable jury could conclude that Newport's written policies failed to provide sufficient guidance to police officers on what constitutes exculpatory evidence.  Newport's 1986 Policies and Procedures Manual, for example, does not explain or define exculpatory evidence.  Further, although the Manual instructs officers on the types of information to record when creating a report, (Doc. # 234-50 at 77, 156-157), it does not purport to define the scope of an investigator's obligation under *Brady*.  In fact, some of the policies contained in the manual arguably run contrary to *Brady*'s requirements.  For instance, the manual tells officers not to record the names of witnesses they interview, (*id.* at 80), a policy that the Newport Police Chief Thomas Fromme testified was in place to protect victim privacy, (Doc. # 234-68 at 51).  The Manual also fails to articulate a duty on the part of investigators to affirmatively disclose exculpatory evidence to the prosecutor.  In the similar case of *Jackson v. City of Cleveland*, the Sixth Circuit held that a law enforcement policy manual "could be read as insufficient to inform officers of their disclosure obligations, as none of the rules in the Manual explicitly mandated disclosure of exculpatory witness statements to prosecutors." 925 F.3d at 835.

In response, Newport contends that the Manual is not deficient because it directs officers to preserve "pertinent" information, which Newport Officer Fromme testified included exculpatory evidence.  (Doc. # 223-2 at 13).  But Fromme also admitted that "pertinent" is not defined in the policy.  (Doc. # 234-51 at 105).  Moreover, Fromme made clear that the term "pertinent" actually *excluded* exculpatory material that an officer found

to be unreliable. (*Id.* at 108). As an example, Fromme stated that under the "pertinent" standard, an officer would not be required to document a confession to a crime from an individual whom the officer thought to be lying. (*Id.* at 109-110). Accordingly, the Manual's declaration that "all pertinent information shall be kept in a jacket file," (Doc. # 234-50 at 156), is not equivalent to a requirement that investigators record and maintain material, exculpatory evidence.

Along the same lines, Newport refers to the admonition in the Manual that all investigative reports be "truthful, complete, and legible" and devoid of "inaccurate, false, or misleading information." (Doc. # 257 at 4) (citing Doc. # 234-50 at 246). While this policy language is laudable, it says nothing about an officer's duty with regard to exculpatory information.

A reasonable jury could further conclude that Newport's training program failed to compensate for the city's inadequate written policies on the handling of exculpatory evidence. Defendant Wagner testified that he did not receive formal training by the Newport Police Department on how to interview witnesses or suspects in a criminal investigation and could not recall receiving formal training on how to document exculpatory or impeachment evidence in a police report. (Doc. # 234-7 at 71). Similarly, Defendant Desentz testified that she had not received training on report-writing beyond documenting "who, what, when, where, and how." (Doc. # 234-54 at 26). Desentz also had not received training on notetaking. (*Id.* at 29). And Defendant Brandt could not recall whether he had received formal training on the types of information that needed to be disclosed to prosecutors in a criminal investigation. (Doc. # 223-3 at 194). Testimony to this effect has been held sufficient to create a dispute of fact as to whether a

municipality adequately trained its police officers in their *Brady* disclosure obligations. *See Jackson*, 925 F.3d at 835-36.

Newport presents arguably conflicting deposition testimony, such as Fromme's testimony that he was trained "probably many times over" regarding what qualifies as exculpatory or impeachment evidence. (Doc. # 257 at 4) (quoting Doc. # 234-51 at 106). However, these conflicts in the evidence are for the jury to resolve. *See Jackson*, 925 F.3d at 835. In any case, even assuming Newport conducted *Brady* training, Fromme admitted that officers would have been trained to disclose "pertinent" information consistent with Newport's written policy. (Doc. # 234-51 at 106-109). As discussed, this standard of disclosure granted officers discretion as to what to include in their investigative files. At least one court has concluded that in such a case, there is a jury question regarding whether a municipality's *Brady* training was adequate. *See Jordan v. Blount Cnty.*, 458 F. Supp.3d 870, 884 (E.D. Tenn. 2020).

In addition, Plaintiff has met his burden on the second element of his failure-to-train claim, as a reasonable jury could conclude that Newport was deliberately indifferent to the risks of failing to train its officers. A plaintiff may meet the deliberate-indifference standard by showing "either (1) 'prior instances of unconstitutional conduct demonstrating that the City had notice that the training was deficient and likely to cause injury but ignored it' or (2) 'evidence of a single violation of federal rights, accompanied by a showing that the City had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation.'" *Jackson*, 925 F.3d at 836 (quoting *Campbell v. City of Springboro*, 700 F.3d 779, 794 (6th Cir. 2012)). Plaintiff pursues the second method of showing deliberate indifference, and correctly argues that *Jackson v. City of*

*Cleveland* is controlling on this point. In *Jackson*, the Sixth Circuit reaffirmed its holding in *Gregory v. City of Louisville* that "a 'custom of failing to train its officers on the handling of exculpatory materials is sufficient to establish the requisite fault on the part of the municipality' for a deliberate-indifference claim." *Jackson*, 925 F.3d at 836 (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006)).

Finally, Plaintiff has demonstrated a dispute of fact regarding the third element—that the inadequate training "was closely related to or actually caused the injury.'" *Jackson*, 925 F.3d at 834. For example, were Plaintiff to prove at trial that Defendant Wagner violated *Brady* by failing to disclose the pretrial payment to Joe Womack, a jury could easily conclude that the violation resulted from inadequate training on proper report writing or the rules governing what constitutes exculpatory evidence.

As Plaintiff has met his burden with regard to each element of his failure-to-train claim, the City of Newport's Motion for Summary Judgment on this claim is **denied**.

## H. Negligent Supervision (Count IX)

Plaintiff's remaining claim for negligent supervision, brought against the municipal Defendants as well as Individual Newport Officers Fromme, Page, and Sears, (Doc. # 49-1 at 33-34), was expressly abandoned by Plaintiff's counsel during oral argument, (Doc. # 291 at 114). Accordingly, that claim is **dismissed** as to these Defendants.

## V. CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1) Defendants City of Cincinnati and Robert Cardone, Mike Phillips, and Mike Slayback's Motion for Summary Judgment (Doc. # 215) is **GRANTED**;

(2)     Defendants City of Norwood and Steve Daniels' Motion for Summary Judgment (Doc. # 216) is **GRANTED**;

(3)     Defendant City of Newport's Motion for Summary Judgment (Doc. # 223) is **GRANTED IN PART and DENIED IN PART**.  Specifically,

(a)     The City of Newport's Motion is **GRANTED** on **Count VII** (municipal liability) to the extent Plaintiff's claim is based on a failure to supervise; and

(b)     The City of Newport's Motion is **DENIED** on **Count VII** (municipal liability) to the extent Plaintiff's claim is based on a failure to train.  Therefore, this claim may proceed.

(4)     Individual Newport Defendants Robert Bradford, Marc Brandt, Sarah Desentz, Tom Fromme, Pat Moore, Howard Niemeier, Rick Sears, and Norman Wagner's Motion for Summary Judgment (Doc. # 212) is **GRANTED IN PART AND DENIED IN PART**.  Specifically,

(a)     The Individual Newport Defendants' Motion is **GRANTED IN FULL** as to Defendants Robert Bradford, Sarah Desentz, Tom Fromme, Pat Moore, Howard Niemeier, and Rick Sears;

(b)     The Individual Newport Defendants' Motion is **GRANTED** on **Count I** (due process) as it pertains to Defendant Sears to the extent that Plaintiff claims Sears withheld evidence of alternative suspect Isaac Grubbs (*Brady* theory 1);

(b)     The Individual Newport Defendants' Motion is **GRANTED** on **Count I** (due process) as it pertains to Defendants Brandt and Wagner to the extent that Plaintiff claims those Defendants withheld evidence implicating suspect James

Becker (*Brady* theory 2) and withheld evidence of fabricated and coerced testimony from witness Joe Womack (*Brady* theory 3);

(c)    The Individual Newport Defendants' Motion is **DENIED** on **Count I** (due process) as it pertains to Defendant Wagner to the extent that Plaintiff claims Wagner withheld evidence of a pretrial payment to witness Joe Womack (*Brady* theory 4);

(d)    The Individual Newport Defendants' Motion is **DENIED** on **Count I** (due process) as it pertains to Defendants Brandt and Wagner to the extent that Plaintiff claims those Defendants withheld evidence obtained in a serial killer investigation (*Brady* theory 5);

(e)    The Individual Newport Defendants' Motion is **GRANTED** on **Count II** (malicious prosecution), **Count III** (fabrication of evidence), **Count V** (failure to intervene), **Count VI** (civil conspiracy), and **Count IX** (negligent supervision), as it pertains to all Individual Newport Defendants;

(f)    Plaintiff's remaining due process claim in Count I against Individual Newport Defendants Brandt and Wagner may proceed based on *Brady* theories 4 and 5 (withholding evidence of pretrial payment to Wagner and evidence collected in serial killer investigation).

(5)    The Individual Newport Defendants' Motion to Strike (Doc. # 284) is **GRANTED**; and

(6)    Plaintiff William Virgil's claims against Defendants City of Cincinnati, Robert Cardone, Mike Phillips, Mike Slayback, City of Norwood, Steve Daniels, Ken Page,

Robert Bradford, Sarah Desentz, Tom Fromme, Pat Moore, Howard Niemeier, and Rick

Sears are **DISMISSED WITH PREJUDICE**.

This 24th day of June, 2021.



Signed By:
David L. Bunning
United States District Judge

J:\DATA\ORDERS\Cov2016\16-224 MOO Granting MSJ in Part.docx